OPINION
GILDEA, Chief Justice.
The question presented in this case is whether court approval is required before a guardian who has the power to consent to necessary medical treatment for a ward under Minn.Stat. § 524.5-313(c)(4)(i) (2012), may consent to remove the ward from life-sustaining treatment when all the interested parties agree that such removal is in the ward’s best interests. The district court held that a guardian who possesses the medical-consent power under Minn.Stat. § 524.5 — B13(c)(4)(i), cannot consent to the removal of a ward’s life support without prior court approval. The court of appeals reversed, holding that unless otherwise limited by court order, a guardian given the statutory medical-consent power has the authority to consent to the removal of life-sustaining treatment without a separate order from the district court. Because we conclude that the guardian did not need further court approval, we affirm.
On September 24, 2007, a social worker at appellant Jeffers Tschumy’s nursing facility filed a petition asking the Hennepin County District Court to appoint a guardian for Tschumy. The social worker said 53-year-old Tschumy was “an incapacitated person” who “lack[ed] sufficient understanding or capacity to make or communicate responsible decisions concerning his person.” According to the social worker, Tschumy was “facing multiple medical issues” and was “unable to make informed medical decisions.”
After a hearing, the district court appointed Tschumy’s then conservator to be his guardian. The court found “clear and convincing evidence” that Tschumy was “an incapacitated person” who needed a guardian. See Minn.Stat. § 524.5-310(a)(1) (2012) (“The court may appoint a ... guardian ... only if it finds by clear and convincing evidence that ... the respondent is an incapacitated person.”). The court made several findings of fact regarding Tschumy’s needs at the time, many of which referred to his inability to make medical decisions for himself. The court said Tschumy needed assistance providing for his “health care, housing, food, transportation, and finances,” and acknowledged that Tschumy did not appropriately manage his diabetes. The court also found that Tschumy was “incapable” of exercising certain “rights and powers,” including the ability to consent to necessary medical care. In the letters of guardianship, the court gave the guardian the authority to, among other things, “[g]ive any necessary consent to enable, or to withhold consent for, the Ward to receive necessary medical or other professional care, counsel, treatment or service.”
On October 6, 2009, the court replaced the first guardian with respondent Joseph Vogel. The court gave Vogel the same powers as the prior guardian and also named Vogel to be Tschumy’s conservator. The successor letters of general guardianship said Vogel had the power and authority to “[g]ive any necessary consent to enable, or to withhold consent for, the Ward to receive necessary medical or other professional care, counsel, treatment or service.”
*732 On April 15, 2012, Tschumy choked on a sandwich and went into respiratory and cardiac arrest. Tschumy lost his pulse, and the group home staff administered CPR. Doctors at Abbott Northwestern Hospital were able to remove fragments of the sandwich, but a CT scan showed Tschumy had an “anoxic brain injury.”[1] In a report later filed with the district court, Tschumy’s attorney laid out a dire prognosis for Tschumy. He said that since Tschumy had been in the hospital, “his conditions of severe and irreversible anoxic encephalopathy,[2] continuous seizures, and respiratory failure have not improved.” Initial opinions of the doctors regarding Tschumy’s “dismal prognosis for return of meaningful neurologic recovery” were confirmed as time passed, “as his seizures [could not] be controlled without deep sedation” and seizure medication. Tschumy’s treatment team was in “unanimous agreement that this unfortunate man [had] suffered irreversible brain damage and [could not] survive.”
On April 28, 2012, Allina Health System, d/b/a Abbott Northwestern Hospital, filed a motion asking the Hennepin County District Court to amend the successor letters of general guardianship to “specifically authorize the guardian to request removal of life support systems.” The district court held a hearing the next day. Vogel opposed the motion to amend the successor letters, arguing that he already had the authority to approve the removal of life support. The court appointed attorney Michael Biglow to represent Tschumy, investigate what Tschumy would want, and make a recommendation to the court.
At a separate hearing the next week, Vogel testified that he had been a professional guardian and conservator for 24 years. Vogel said that prior to the April 2012 incident, he had tried to talk to Tschumy about what he would want to do in end-of-life situations, but that Tschumy “did not wish to talk about advanced directives.” Vogel was not surprised by Tschumy’s unwillingness because of Tschu-my’s “severe and chronic mental illness, and his attitudes towards the medical profession.” Nonetheless, Vogel testified that he believed he had the authority to direct the hospital to remove Tschumy’s life support. He said the court authorized him to “provide medical decision making for Mr. Tschumy when [he] was unable to do so and that medical decision making would be not only the provision of different medical services but the ending of those services ... [if] appropriate.” Vogel said he visited Tschumy, talked to doctors and nurses, and relied on his own observations of Tschumy over the course of the guardianship to decide that the hospital should remove Tschumy’s life support.
Tschumy’s attorney, Michael Biglow, also testified. Based on his investigation, Biglow said he believed Tschumy “would not want to be inside, confined to a hospital bed, having medical decisions made for him, by medical personnel and therefore, he would most likely opt not to have these life support services in place.” Tschumy, he said, “would prefer to be ... allowed to die naturally.” Biglow also noted in his report that the hospital’s ethics committee recommended that life support be removed because the “burdens and risks” of continued treatment “heavily outweigh any possible benefits.”
In an order filed May 11, 2012 (“May order”), the district court authorized the guardian and the hospital to remove Tschumy’s life support systems. The *733 court held that the medical power granted to a guardian does not grant the guardian the unrestricted authority to direct the removal of life support but said it would explain that holding in a later order, so as not to postpone Tschumy’s removal from life support. Tschumy was removed from life support, and he difed soon thereafter. On May 17, 2012, the court discharged Vogel as Tschumy’s guai’dian.
On October 18, 2012, the district court filed a second order (“October Order”), explaining why it concluded guardians do not have the power under Minn.Stat. § 524.5-313(e)(4)(i), to direct the Removal of life support without prior court approval. The court explained that the medical power granted to guardians under the statute does not give guardians the unrestricted authority to direct the removal of life support. According to the court, the power to direct removal of life support “is not inherent in any of the enumerated powers normally granted a guardian,” and therefore guardians seeking that power needed specific authorization from the district court.
Vogel appealed the district court’s October order.[3] The court of appeals asked the parties to file “informal memoranda” addressing three questions: whether the district court’s October order was independently appealable, whether Vogel had standing to appeal, and whether the appeal was moot. In re Guardianship of Tschu-my, No. A12-2179, Order at 3-4 (Minn. App. filed Dec. 19, 2012). After the parties filed their informal memoranda, the court of appeals ruled that the case was properly before it. In re Guardianship of Tschumy, No. A12-2179, Order at 4 (Minn. App. filed Feb. 20, 2013). Specifically, the court found that the appeal was timely, Vogel had standing to appeal, and the case was not moot because it was “capable of repetition, yet evad[ed] review” and involved an important public issue of statewide significance. Id. at 2-4.
With respect to the merits of the case, the court of appeals reversed the district court. In re Guardianship of Tschumy, 834 N.W.2d 764, 775 (Minn.App.2013). The court of appeals held that absent a limitation in the guardianship order, “the medical-consent power granted to a guardian” under Minn.Stat. § 524.5-313(c)(4) includes the power to authorize disconnection of a permanently unconscious ward’s life-support systems “without further authorization from the district court.” Id. at 775. We granted the petition for review that Biglow, Tschumy’s court-appointed attorney, filed.
I.
We turn first to the question of whether we have jurisdiction to decide this case. The parties do not contend that we lack jurisdiction. But the existence of a *734 justiciable controversy is essential to our exercise of jurisdiction, so we can raise the issue on our own. In re Schmidt, 443 N.W.2d 824, 826 (Minn.1989). And the question of our jurisdiction is a legal one that we review de novo. In re McCaskill, 603 N.W.2d 326, 327 (Minn.1999).
A.
There are several interrelated, potential jurisdictional problems in this case. Tschumy has died, and no ruling we make will affect him. Vogel has been discharged as Tschumy’s guardian, and similarly, no ruling we make will affect the scope of his guardianship over Tschumy. As a result, there are questions about the parties’ continuing interest in this case, as well as questions about Vogel’s standing to appeal the district court’s October order and Tschumy’s standing to appeal the court of appeals decision. See Twin Cities Metro. Pub. Transit Area v. Hotter, 311 Minn. 423, 425 n. 3, 249 N.W.2d 458, 460 n. 3 (1977) (“That a party must be aggrieved in order to appeal remains fundamental to ... Rule 103.03, Minnesota Rules of Civil Appellate Procedure.”). When the case began, both parties before us had a clear interest in the case. But the parties may have subsequently lost that interest. In this context, the jurisdictional question presented is fundamentally one of mootness. As the Supreme Court has recognized, mootness is “the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citation omitted) (internal quotation marks omitted).[4]
*735 We have dismissed appeals for lack of jurisdiction where the issues in the case were moot. E.g., In re Inspection of Minn. Auto Specialties, Inc., 346 N.W.2d 657, 658 (Minn.1984). We do so because courts are designed to decide actual controversies. State v. Brooks, 604 N.W.2d 345, 347 (Minn.2000). We will also dismiss cases as moot if we are unable to grant effective relief. In re Minnegasco, 565 N.W.2d 706, 710 (Minn.1997); In re Schmidt, 443 N.W.2d at 826.
We have not previously considered whether we should dismiss an appeal that arises in the unusual context presented itere.[5] Several states have addressed the mootness issue in this context, however, and almost all of them have concluded that even though the person on life support had died pending an appeal, the appellate court should still resolve issues over the authority to order the discontinuation of life-sustaining treatment. Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674, 680 (1987) (deciding question of whether guardian had authority to authorize removal of life-sustaining treatment even though ward died pending the appeal because case fell within exception to mootness doctrine); see In re Guardianship of L.W., 167 Wis.2d 53, 482 N.W.2d 60, 64-65 (1992) (same).[6] These cases recognize that *736 an appellate court has the authority to decide the question presented as an exception to the mootness doctrine.
Our precedent similarly permits us to exercise our discretion to consider a case that might be technically moot as an exception to our mootness doctrine. We have said that we have authority to decide cases that are technically moot when those cases are functionally justiciable and present important questions of statewide significance. E.g., State v. Rud, 359 N.W.2d 578, 576 (Minn.1984). Our mootness doctrine therefore is flexible and discretionary; it is not a mechanical rule that we invoke automatically. Kahn v. Griffin, 701 N.W.2d 815, 821 (Minn.2005).[7] Our prece *738 dent illustrates our careful analysis of all aspects of the issues presented before we determine whether to dismiss the case or exercise our discretion to consider the appeal as an exception to the mootness doctrine.
For example, in State v. Rud, the question presented was whether a defendant, accused of criminal sexual conduct, could compel the alleged child victims and other potential child witnesses to testify at the defendant’s omnibus hearing. 359 N.W.2d at 575. The district court concluded that the defendant did not have the right to subpoena these witnesses, but the court of appeals reversed. Id. After we granted the State’s petition for review, the State dismissed the charges against the defendant. Id. at 576. Even though there was no longer a live controversy between the parties, we declined to dismiss the appeal and instead resolved the question presented in the case. Id. We did so because the case was “functionally justiciable,” and “the issues presented are important public issues of statewide significance that should be decided immediately.” Id.
With respect to the first requirement, we said that “[a] case is functionally justi-ciable if the record contains the raw material (including effective presentation of both sides of the issues raised) traditionally associated with effective judicial decision-making.” Id. We held that the requirement was met, noting the quality of both parties’ arguments and the fact that the parties “agree[d] that the appeal should not be dismissed as moot.” Id. In discussing the second requirement, we expressed concern about the “adverse impact” that could occur in pending criminal cases if we declined to resolve the issues in Rud but were to wait for those issues to be presented in a future case. Id. Based on that concern and the importance of the issues presented, we exercised our discretion to decide those issues in Rud. Id.
We reached the same conclusion in Jasper v. Commissioner of Public Safety, 642 N.W.2d 435 (Minn.2002). In that case, a driver whose license was revoked challenged the revocation, contending that the commissioner’s rule approving use of the equipment at issue was not valid. Id. at 436. The district court rejected the challenge and the court of appeals affirmed. Id. After we granted the driver’s petition for review, the commissioner promulgated *739 a new rule approving the use of the equipment at issue. Id. at 439 n. 4. The promulgation of the new rule led us to consider whether we should dismiss the appeal as moot. Id. at 439. Because the record “contained] detailed information regarding” the equipment at issue and “the parties ably briefed and argued the issue of whether [the equipment] was properly approved” by the earlier rule, we held that the issue was functionally justiciable. Id. We also concluded that the equipment at issue in the case “[was] the only breath-testing instrument currently in use in this state, and there has been substantial litigation in the district courts as to whether the instrument was properly approved.” Id. Based on this analysis, we determined that the issue presented in Jasper was “one of public importance and statewide significance that should be decided immediately,” and proceeded to the merits. Id. at 439-40; see also State v. Matthews, 779 N.W.2d 543, 548 (Minn.2010) (exercising discretion to decide a jury instruction issue “related to an unadjudicated jury verdict” because the issue was functionally justicia-ble and “one of public importance and statewide significance”).[8]
We reached the opposite conclusion in Limmer v. Swanson, 806 N.W.2d 838, 839 (Minn.2011). Even though the two requirements of functional justiciability and an important public issue of statewide significance existed, we declined to exercise our jurisdiction and dismissed the case as moot. Id. The question presented in Lim-mer was whether the judiciary could authorize certain expenditures by the executive branch in the absence of legislative appropriations. Id. at 838. While the case was pending, the Legislature passed and the Governor signed into law appropriations bills for all executive branch agencies covering the time period in question in the case. Id. at 838-39. We agreed that we had the authority to decide the case. Id. at 839. But we declined to exercise that authority because the case presented “fundamental constitutional questions about the relative powers of the three branches of our government” and because of our reluctance to resolve such questions “‘unless it is necessary to do so.’” Id. (quoting State v. N. Star Research Dev. Inst., 294 Minn. 56, 81, 200 N.W.2d 410, 425 (1972)). Rather than exercising our discretion to decide the constitutional question, we deferred to the ability of the executive and legislative branches to “put mechanisms in place that would ensure *740 that” the issue presented in the case did not arise in the future. Id.
B.
With these cases in mind, we turn to the jurisdictional question presented here. Our analysis in the cases discussed above where we interpreted our mootness doctrine leads us to conclude that we should exercise our discretion to decide the issue raised in this case. The question of whether a guardian needs prior court approval to consent to the removal of life-sustaining treatment is functionally justiciable. The question was ably briefed and argued by the parties and the record contains the factual information necessary for a decision. In addition, there was thoughtful and informative amicus support for the position that each party advocated. We likely would not have any more information at our disposal if we were to wait for another case to present the same issue. See Rud, 359 N.W.2d at 576 (“[Rjather than waiting for another case presenting these same issues, which are now properly before us and ready for decision, we decide them now.”).
In addition, this case presents an important public issue of statewide significance. Guardianship law exists as a function of the State’s parens patriae[9] power to protect “infants and other persons lacking the physical and mental capacity to protect themselves.” In re Pratt, 219 Minn. 414, 422, 18 N.W.2d 147, 152 (1945). The State possesses this protective power as “an attribute of sovereignty” and exercises it in the manner provided by statute. Id. at 422, 18 N.W.2d at 152. Courts play a vital role in supervising guardians as they exercise the power of the State to watch over Minnesota’s most vulnerable citizens. See Minn.Stat. § 524.5-313(a) (stating that guardians are “subject to the control and direction of the court at all times and in all things”). Not only does this case involve this special area of law, but it also involves issues of life and natural death and the ability of incapacitated Minnesotans to exercise self-determination when it comes to declining further medical treatment.
The impact of uncertainty on such an important question also counsels in favor of exercising our discretion to resolve this issue in this case. The district court’s May order notes “that there are thousands of guardians in Minnesota holding the same power that Mr. Vogel has.” And in her amicus brief, the Attorney General represents that there are over 12,000 wards under State supervision in Minnesota. A decision from our court will help clarify for the guardians and their wards the scope of the guardians’ authority to make one of life’s most fundamental decisions.
We acknowledge the possibility that the issue presented here could arise in a future case. After all, the essence of the question presented in this case has been before our court previously. See In re Con-servatorship of Torres, 357 N.W.2d 332 (Minn.1984). In that case, the district court authorized a conservator to remove life-sustaining treatment, but the court stayed the operation of its order pending appeal. Id. at 336. We did not issue our opinion until 7 months after the district court stayed the operation of its order. The record in this case convinces us that the procedure used in Torres is not the path that best serves the welfare of the person under the State’s protection and supervision. Id. at 338 (“Under Minnesota law, a probate court must act in the ‘best *741 interests’ of the wal'd or conservatee in a guardianship proceeding.” (quoting In re Schober, 803 Minn. 226, 280, 226 N.W.2d 895, 898 (1975))); see also State ex rel. Raymond v. Lawrence, 86 Minn. 310, 312, 90 N.W. 769, 770 (1902) (“The welfare of the ward is the chief matter to be considered.”).
Indeed, the procedure used in Torres, which required the wdrd to be kept alive, would be unjust and unnecessarily cruel had it been forced upon Tschumy. This is so because even during the brief period that the district court deliberated about whether to allow the hospital tq remove Tschumy from life support systems, the evidence was that Tschumy suffered continual seizures that could not be cdntrolled unless his physicians forced him, through medication, further into unconsciousness: into “deep sedation.” And according to the physicians, continuing medical intervention was not only “futile,” but was likely “harmful” to Tschumy. The sound exercise of judicial discretion does not permit us to ignore the potential harm that the most vulnerable would face were we to dismiss this case in the name of preserving for appellate review the purity of an active controversy in a future case.[10]
Because this case is functionally justicia-ble and the issue presented is one of public importance and statewide significance that we should decide now, our precedent provides us with the authority to decide this case even though it is technically moot. See, e.g., Rud, 359 N.W.2d at 576. The reasons we discuss above that favor the exercise of this discretion are compelling. And, unlike in Limmer, there are no countervailing constitutional and prudential considerations warranting a decision not to exercise jurisdiction in this case. See 806 N.W.2d at 839. The prudential considerations weigh heavily in favor of exercising jurisdiction in the unusual context presented here, given that it is our obligation to afford paramount consideration to the “welfare” of the ward. Lawrence, 86 Minn, at 312, 90 N.W. at 770. We therefore hold that we have jurisdiction and turn to the merits of the case.[11]
*742 II.
We are asked to decide whether a guardian appointed under Minn.Stat. § 524.5-313(c)(4)(i) has the authority to make a decision to discontinue a ward’s life-sustaining treatment without first seeking a court order. This is a question of statutory interpretation that we review de novo. In re Welfare of J.B., 782 N.W.2d 535, 539 (Minn.2010).
The statute generally authorizes the district court to appoint a guardian for an “incapacitated person” in need of assistance with decision making. Minn.Stat. § 524.5-313(c). Guardians so appointed are “subject to the control and direction of the court at all times and in all things.” Minn.Stat. § 524.5-313(a) (2012). And the statute authorizes the court to “grant to a guardian only those powers necessary to provide for the demonstrated needs of the ward.” Minn.Stat. § 524.5-313(b) (2012).
Paragraph (c) in the statute is the focus of the dispute here. This provision provides:
The duties and powers of a guardian or those which the court may grant to a guardian include, but are not limited to:
[[Image here]]
(4)(i) the power to give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service, except that no guardian may give consent for psychosurgery, electroshock, sterilization, or experimental treatment of any kind unless the procedure is first approved by order of the court as provided in this clause. The guardian shall not consent to any medical care for the ward which violates the known conscientious, religious, or moral belief of the ward[.]
Minn.Stat. § 524.5-313(c).
Section 524.5-313(c)(4)(i) gives guardians “the power to give any necessary consent to enable the ward to receive necessary medical or other professional care, counsel, treatment, or service.” The essence of the parties’ dispute is whether the medical-consent power includes the authority to direct that a ward be removed from life support systems. Vogel argues that it does.
For his part, Tschumy, through his attorney, contends that the statute does not give guardians the power to authorize the removal of life support systems. He offers several arguments in support of that contention. Tschumy argues that because decisions regarding life support are so significant, the district court must specifically authorize them. Tschumy next argues that because life-sustaining treatment was not necessary when the district court appointed his guardian, the guardian therefore does not have the power to withdraw such treatment. And Tschumy contends that because the decision to remove a ward from life support systems includes more than simply a medical decision, the medical-consent power in the statute does not cover decisions to discontinue life support. Finally, Tschumy argues that his right to due process compels the conclusion that his guardian did not have the authority to remove him from life support. We consider each of Tschumy’s arguments in turn.[12]
A.
We turn first to Tschumy’s argument that because the authority to make deci *743 sions regarding life and death matters is so significant, the guardian does not have the authority to make those decisions in the absence of an express grant of authority over such decisions. Specifically, Tschumy argues that under Minn.Stat. § 524.5-313(c)(4)(i), the duties and powers of guardians “clearly and unambiguously do not include the power to terminate life support services,” and that a decision by a guardian that “results in the death of a ward” is “better dealt with as an additional power that the court may grant above and beyond the listed powers in the statute.” We are not persuaded.
It is true, as Tschumy argues, that the statute does not directly address decision making regarding the provision of life-sustaining treatment through use of the words “withdraw,” “discontinue” or “terminate.” But Tschumy does not contend that the treatment at issue is not medical treatment, and he apparently agrees that Vogel had the authority, under Minn.Stat. § 524.5 — 313(c)(4)(i), to consent to Tschumy being placed on the life support systems. Tschumy argues, in essence, that the authority to discontinue such treatment, because of the consequences of such a decision, leads to the conclusion that the guardian lacks the authority to make the decision to discontinue the treatment. We disagree.
To adopt Tschumy’s reading, we would have to conclude that the power to “consent” to necessary medical treatment does not include the power to withdraw that consent. The plain and ordinary meaning of “consent” is “[a]greement, approval, or permission as to some act or purpose, esp. given voluntarily by a competent person; legally effective assent.” Black’s Law Dictionary 368 (10th ed.2014). The concept of “consent” is premised on the idea of voluntary decision making, which necessarily includes the ability to choose to say “no.” Indeed, when the continued medical treatment of the ward is no longer necessary and no longer in the best interests of the ward because the ward has no reasonable chance to recover, the guardian has not just the ability but likely the duty to decline to consent to continuing medical treatment that harms the ward. See In re Guardianship of Overpeck, 211 Minn. 576, 583, 2 N.W.2d 140, 144 (1942) (“The best interests of the ward should be the decisive factor in making any choice on his behalf.”).
A contrary reading of the statute eliminates this duty and it would lead to a fragmentation of the power of consent that could allow health care providers to subject wards to useless medical procedures simply because the guardian would not have the power to withdraw consent to further treatment. Such a result would, in effect, “reduce the guardian’s control over medical treatment to little more than a mechanistic rubberstamp for the wishes of the medical treatment team.” Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674, 688 (1987); see also In re Law-rance, 579 N.E.2d 32, 39 (Ind.1991) (“This right to consent to the patient’s course of treatment necessarily includes the right to refuse a course of treatment.”); In re Rid-dlemoser, 317 Md. 496, 564 A.2d 812, 816 n. 4 (1989) (holding that by necessary implication, the power to give consent for medical treatment “includes the power to withhold or withdraw consent”). In other words, reading “consent” as not including the authority to withdraw consent to life-sustaining treatment is not a reasonable interpretation of section 524.5-313(e)(4)(i). See Savela v. City of Duluth, 806 N.W.2d 793, 797 n. 1 (Minn.2011) (rejecting alternative reading of statute as unreasonable and concluding statute was not ambiguous).
Tschumy’s reading of section 524.5-313(c)(4)(i) is also inconsistent with *744 our precedent. We have held that it would be unreasonable to interpret the guardianship statute to mean that guardians must “obtain express approval for every act relating to the personal care and custody of the ward’s person.” Grier v. Estate of Grier, 252 Minn. 143, 147, 89 N.W.2d 398, 402 (1958). Although a guardian is accountable to the court for his acts, “his statutory authority is not to be construed — in absence of express language so requiring — as placing him in a legal straitjacket which deprives him of all discretion and flexibility in meeting the needs of the ward.” Id. at 148, 89 N.W.2d at 402-03. Rather, guardianship statutes “are designed to provide flexibility and adaptability in caring for the ward according to his changing needs.” Id. at 148, 89 N.W.2d at 403. Reading the statute the way Tschu-my does is inconsistent with our analysis in Grier.
In addition, many decisions about medical treatment, such as consent to certain surgeries or treatments with grave side effects, could be characterized as involving life and death determinations. If we were to adopt Tschumy’s reading of the statute, all of these types of medical decisions would require separate court approval unless each was specified in the guardian’s appointment order. There is no basis in the statutory language for such a restrictive reading of the broad medical consent power. The plain language of the statute supports the opposite conclusion. This is so because where the Legislature intended specific court approval for certain types of treatment, the Legislature expressly provided for that approval in the statute. See Minn.Stat. § 524.5 — 313(c)(4)(i) (requiring specific court approval “for psychosurgery, electroshock, sterilization, or experimental treatment of any kind”).
Tschumy relies on this same statutory language and argues that the language requiring court approval before a guardian may consent to psychosurgery, electroshock, sterilization, or experimental treatment of any kind supports the conclusion that guardians should similarly be required to seek court approval before removing life support. He contends that because these extraordinary powers “are by their nature, life changing with permanent and unknown consequences and side effects,” terminating life support “should be in the same category.” This argument, however, is fundamentally a policy argument rather than one based on the language of the statute.
The statute uses very broad language, providing the guardian with authority to give any necessary consent for necessary medical care and treatment, except for the four listed types of treatment that require court approval. Minn.Stat. § 524.5-313(c)(4)(i). The statutory language confirms that the Legislature did not intend that guardians come back to court to receive specific court permission to consent to the removal of a ward’s life support. See also In re Welfare of Colyer, 99 Wash.2d 114, 660 P.2d 738, 747 (1983) (declining to read the withdrawal of life-sustaining treatment into the Washington statute enumerating four exceptions to a guardian’s authority to make medical decisions).
Tschumy also argues that our decision in In re Torres compels the conclusion that the guardian did not have the authority to authorize removal from life support. 357 N.W.2d 332. In our view, Torres does not compel either result the parties advocate. In Torres, we held that probate courts have the authority to authorize the removal of life support from a comatose ward, even though the removal could result in the ward’s death. Id. at 337. We found authority for the court to do so in myriad sources, including the Minnesota Constitution, the Patients’ Bill of Rights, and the *745 statutory language of whdt is ndw Minn. Stat. § 524.5-313(c)(4)(i). Toms, 357 N.W.2d at 337-38.
We declined to say whether the medical-consent provision alone could provide the court with statutory authority to authorize the removal of life support, Citing the medical-consent provision, Torres’s court appointed counsel argued that the conservator [13] “may only be given the power to consent to necessary medical care,” and argued that “a conservator’s order to remove a conservatee’s life supports is not a ‘consent to necessary medical carp.’ ” Id. at 337. We said that this argument “may accurately describe the scope pf a conservator’s power if the conservator is granted only [the medical-conseht power.]” Id. (emphasis added). We then noted that a court has the statutory power to grant greater authority than that specifically listed in the statute. Id. Thus, in Torres we held that even if the medical-Consent provision does not provide authority for a district court to authorize removal from life support, such authority existe<| elsewhere in the statute. Id. Because we never specifically ruled on the scope of j&e medical-consent provision, Torres does not support the conclusion that a guardian does not have the power to order a warp to be removed from life support when the court has granted the guardian the medical-consent power outlined in MbimStat. § 524.5-313(c)(4)(i).
B.
We turn next to Tschumy’s argument that the guardian did not have the authority to agree to remove tschumy from life support because Tschumy did not need life-sustaining treatment when the district court appointed the guardian. Specifically, Tschumy argues that under the statute, guardians possess only those powers that the district court grants, and district courts have the authority to grant only those powers that are “necessary” to take care of the “demonstrated needs” of the ward. Minn.Stat. § 524.5-313(b). According to Tschumy, the removal of life support was not one of his “demonstrated needs” at the time the guardian was appointed, and therefore, that power was not granted to his guardian. In addition, Tschumy argues that the court has the power to control and direct the guardian “at all times and in all things,” so it is reasonable to conclude that the court can request the guardian to appear in court sometime after the initial appointment proceeding. See Minn.Stat. § 524.5-313(a); In re Guardianship of Mikulanec, 356 N.W.2d 683, 688 (Minn.1984) (courts limit powers to the “least amount of power necessary to protect a potential ward in the individual case”).
Tschumy’s position misinterprets the “demonstrated need” of the ward. The “demonstrated need” of a ward for whom the medical-consent power is granted is that he or she is incapable of making medical decisions and cannot meet his or her medical needs. See Minn.Stat. § 524.5-313(c) (giving the court the authority to “appoint a guardian if it determines” the powers listed “are needed to provide for the needs of the incapacitated person ” (emphasis added)); Minn.Stat. § 524.5-102, subd. 6 (2012) (defining an “incapacitated person” as a person who “lack[s] *746 sufficient understanding or capacity to make or communicate responsible personal decisions, and who has demonstrated deficits in behavior which evidence an inability to meet personal needs for medical care”). The “demonstrated need” is not limited to the specific medical conditions the ward has at the time the guardian is appointed.[14] See Grier, 252 Minn, at 148, 89 N.W.2d at 402-08 (discussing the guardian’s “flexibility in meeting the needs of the ward”).
When the social worker at Tschumy’s nursing facility petitioned the district court to appoint a guardian for him, she primarily contended that Tschumy “lack[ed] sufficient understanding or capacity to make or communicate responsible decisions concerning his person,” had “demonstrated behavioral deficits evidencing [an] inability to meet his needs for medical care,” and was “facing multiple medical issues and [was] unable to make informed medical decisions.” See also Mi-kulanec, 356 N.W.2d at 687 (“She lacks sufficient understanding to make a responsible decision concerning the choice of a mate and therefore is incapacitated under the court’s findings.”). The court then found that Tschumy was not adequately managing his diabetes, and that he was “incapable” of exercising the ability to consent to medical care. Tschumy’s “demonstrated need” was assistance in making medical decisions. At the time Vogel was considering whether to discontinue Tschu-my’s life-sustaining treatment, Tschumy was entirely unable to make medical decisions for himself. The decision at issue therefore falls within the authority the district court gave to Tschumy’s guardian.
C.
We next consider Tschumy’s contention, advanced at oral argument, that the medical-consent power in Minn.Stat. § 524.5-313(c)(4)(i) cannot include the ability to remove a ward from life support because such a decision encompasses much more than medical decision making. We disagree.
We certainly recognize that once medical decision making enters the arena of life and death decisions, different interests are at stake. Such decision making could implicate moral and religious considerations, and most importantly, the decision, once it is made, is a permanent decision. See Torres, 357 N.W.2d at 341 (recognizing that the medical profession’s ability to artificially maintain life “creates a wide variety of legal, medical, and ethical problems”); see also Cruzan v. Dir., Mo. Dep’t of Health, 497 U.S. 261, 277, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (recognizing that when dealing with questions over the right to refuse medical treatment, all agree that the issue presents “a perplexing question with unusually strong moral and ethical overtones”). But many “medical decisions” involve a moral or ethical component, regardless of whether life and death is involved. The Legislature recognizes this, by requiring that the guardian not consent to medical care on behalf of the ward if such care “violates the known conscientious, religious, or moral belief of the ward.” See Minn.Stat. § 524.5-313(c)(4)(i). The fact that important interests are at stake therefore does itself not move the decision making from the guardian to a district court.
*747 D.
Finally, we turn to Tschumy’s argument that the U.S. and Minnesota Constitutions support his reading of the statute. Specifically, he argues that the due process rights of wards would be violated if we were to interpret the statute as authorizing guardians to consent to the removal of life-sustaining treatment without first obtaining express approval for that removal from the district court. We are not convinced.
Both the United States and Minnesota Constitutions guarantee that the State cannot interfere with a person’s right to life, liberty, or property without due process of law.[15] U.S. Const, amend XIV, § 1; Minn. Const, art. I, § 7. And while guardians may be “state actors” for the purpose of determining if there has been a due process violation,[16] the State will not actually be depriving a ward of life without due process of law if a guardian pursuant to lawful authority, decides to remove life support without first seeking court approval. There is a fundamental difference between depriving someone of life and letting disease run its course. As the Supreme Court of Wisconsin noted, while the withdrawal of a woman’s feeding tube would certainly result in her death, “it is equally indisputable that the result is the natural death of the body, as contrasted to the unnatural prolongation of, in this case, a vegetative state. The [S]tate does not deprive an individual of life by failing to ensure that every possible technological medical procedure will be used to maintain that life.” In re Guardianship of L.W., 167 Wis.2d 53, 482 N.W.2d 60, 71 (1992); see also John F. Kennedy Mem’l Hosp., Inc. v. Bludworth, 452 So.2d 921, 924 (Fla. 1984) (“The issue in these cases is not whether a life should be saved. Rather, it is how long and at what cost the dying process should be prolonged.”).
E.
Based on our analysis, we hold that a guardian given the medical-consent power in Minn.Stat. § 524.5-313(c)(4)(i), has the authority to authorize removal of a ward’s life-sustaining treatment, without court approval, when all interested parties agree that removal is in the ward’s best interest. As we noted in Torres, family members of comatose patients make the sort of decision that underlies this case with no court involvement. 357 N.W.2d at 341 n. 4. Subjecting wards to a different standard, one that often results in extended suffering for the unconscious ward, is unnecessary and potentially cruel when all the parties agree that ending life support and allowing natural death is the appropriate action.
*748 We understand and share Justice Anderson’s concern for the well-being of incapacitated wards, particularly those who as here, have no family or friends to speak for them. Nothing we say in this opinion should be viewed as prohibiting any interested family member or employee of the hospital or other health care facility from looking to the courts if there is a dispute over what is in the ward’s best interest. When there is no dispute, however, about what the ward would have wanted, or what is in the best interests of the ward, court involvement adds little to the process. Courts are “ill-equipped to pass judgment on the specialized expertise required of a physician, particularly when such a decision is likely to have a direct impact on human life.” Campbell v. St. Mary’s Hosp., 312 Minn. 879, 389, 252 N.W.2d 581, 587 (1977). The district court, of course, has the authority to intervene when the interested parties disagree about the appropriate course of action. But in this case, when the guardian, the involved medical staff, and the hospital ethics committee all agreed that it was in Tsehumy’s best interest to discontinue life-sustaining treatment, the guardian did not need prior court approval to consent to discontinuation of that treatment.
Affirmed.
DIETZEN, J., took no part in the consideration or decision of this case.

. "Anoxic brain injury” is an injury to the brain due to a lack of oxygen. See The American Heritage Dictionary 76 (3d. ed.1992) (defining "anoxia” as the “[ajbsence of oxygen”).

. "Encephalopathy” means “[a]ny of various diseases of the brain.” The American Heritage Dictionary 606 (3d. ed.1992).

. On October 24, 2Q12, the district court ordered that Vogel remain on the case as the conservator of Tschumy's estate pending resolution of the appeal. Justice Stras’s dissent therefore is mistaken iii arguing that Vogel pursued the appeal to assert a purely personal interest. The dissent is also wrong in suggesting that the fact that Tschtimy’s estate is paying for both Tschumy’s lawyer and Vogel is of any relevance in this case. The Legislature provided that Tschümy has the right to counsel and the district court was authorized to appoint counsel to represent Tschumy. See Minn.Stat. § 524.5-120(13) (2012). The Legislature also provided that the estate compensate both the guardian/conservator and counsel to the ward. See Minn.Stat. § 524.5-502 (2012).
During oral argument, an issue arose about the scope of the legal authority of the attorney the district court appointed to represent Tschumy. But the guardian-conservator did not question that authority, and no party briefed the issue. The record on the scope of the authority granted by the district court is, at best, ambiguous. Although we decide that the case is functionally justiciable, we express no opinion on the attorney’s authority or on the details of the process by which the case reached us.

. In contending that we lack jurisdiction, Justice Stras’s dissent argues that the district court's October order was an advisory opinion, which the court lacked the authority to issue. We disagree. As an initial matter, it is important not to lose sight of the fact that this case arises in the guardianship area, an area of law that does not contemplate adversity in the same way as a typical contested case. See, e.g., In re Guardianship of Spangler, 126 Ohio St.3d 339, 933 N.E.2d 1067, 1074 (2010) (“Guardianship proceedings ... are not adversarial but rather are in rem proceedings involving only the probate court and the ward.”); In re Clendenning, 145 Ohio St. 82, 60 N.E.2d 676, 680 (1945) (noting that guardianship proceedings are not adversarial in nature); see also Black's Law Dictionary 913 (10th ed.2014) (noting that the procedural phrase "in re” is used for judicial proceedings "not formally including adverse parties”).
But even more importantly, the parties in this case were adverse at the district court, as they are here, with respect to the statutory interpretation question. Vogel, the guardian, argued below and argues here that he had the authority under Minn.Stat. § 524.5-313(c) to discontinue the ward's life-sustaining treatment without court authorization. Tschumy, the ward, argued that court approval was required. The case on which the dissent relies — Schowalter v. State, 822 N.W.2d 292 (Minn.2012) — therefore is inapposite. Id. at 299 (holding that the adversity requirement was not met when "both parties agree[d]” on the disposition of the issue). The other case the dissent cites — Seiz v. Citizens Pure Ice Co., 207 Minn. 277, 290 N.W. 802 (1940) — is likewise unhelpful. Seiz was a declaratory judgment action challenging the constitutionality of a statute relating to the provision on unemployment benefits. Id. at 277, 290 N.W. at 802. Because the plaintiff was employed and expected to remain so, we concluded that he was not entitled to unemployment benefits and his statutory argument was therefore purely theoretical. Id. at 283, 290 N.W. at 805. Moreover, we said that any dispute as to unemployment benefits would be between the employee or employer, on the one hand, and the state unemployment compensation fund on the other. The dispute would not be between the two parties in the case, the employee and his employer. Id. at 282, 290 N.W. at 804. For these reasons, we concluded that the declaratory judgment action did not present a justiciable controversy. Id. at 285, 290 N.W. at 806. In this case, by contrast, the dispute before the district court was not theoretical. Vogel argued that he had the *735 authority under the guardianship statute to discontinue the treatment at issue. Tschumy argued that further court approval was required. The district court’s order resolved that actual, live controversy in the order that is the subject of this appeal. The dissent comes out differently because the dissent postures the case as involving just the question of whether Tschumy should be removed from life support. In addition to that question, however, the district court was also asked to decide whether, under the statute, Vogel needed court approval to remove Tschumy from life-sustaining treatment.
The dissent also relies on the fact that the district court authorized the removal of life-sustaining treatment in the May order to support the contention that the October order was an advisory opinion. This analysis is not persuasive. In the context of election disputes brought under Minn.Stat. § 204B.44 (2012), our court routinely issues our decision in order form with opinion to follow. See, e.g., Martin v. Dicklich, 2012 WL 4465588, at *1-2 (Minn, filed Sept. 25, 2012). For example, in Martin v. Dicklich, a question was raised as to which name a county auditor should place on the election ballot after one candidate withdrew from the election. Id. Recognizing the necessity for a prompt resolution of the question, we issued a short order on September 25, 2012, directing the auditor to prepare new ballots for the election. Id. The end of the order said: "So as not to impair the orderly election process, this order is issued with opinion to follow.” Id. at *2. More than 2 months later, after the election had been held, we issued our opinion. Martin v. Dicklich, 823 N.W.2d 336 (Minn.2012). We have used a similar process in termination-of-parental rights cases. See, e.g., In re Children of S.E.P. and J.W.P., 744 N.W.2d 381, 382 n. 1 (Minn.2008) (noting that "we issued an order, with written opinion to follow, reversing the court of appeals and reinstating the district court’s order terminating the rights of both parents”). The district court followed a similar process in this case. Just as our opinions in Martin and S.E.P. were not invalid advisory opinions, so too the district court’s October order is not an invalid advisory opinion simply because it was issued after Tschumy had died.

. In the only other case from our court where an issue was raised similar to that raised here, the order authorizing the removal of life-sustaining treatment was stayed pending appeal and the ward in that case was apparently kept alive pending appeal. See In re Conservatorship of Torres, 357 N.W.2d 332 (Minn.1984).

. See also Bartling v. Superior Court, 163 Cal. App.3d 186, 209 Cal.Rptr. 220, 221 (1984); John F. Kennedy Mem’l Hosp., Inc. v. Blud-worth, 452 So.2d 921, 923 (Fla.1984); In re L.H.R., 253 Ga. 439, 321 S.E.2d 716, 718 (1984); Superintendent of Belchertown State Sch. v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 423 (1977); In re Conroy, 98 NJ. 321, 486 A.2d 1209, 1219 (1985); Eichner v. Dillon, 73 A.D.2d 431, 426 N.Y.S.2d 517 (N.Y.App.Div.1980), modified on other grounds sub nom., Matter of Storar, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981) *736 cert, denied, Storar v. Storar, 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); In re Guardianship of Hamlin, 102 Wash.2d 810, 689 P.2d 1372, 1374 (1984).
Justice Stras’s dissent argues that these cases are distinguishable from the case before us because in these cases, there was the "possibility that a court could order meaningful relief in favor of either the ward or the ward's estate.” That distinction is simply not borne out by the cases. In all of these cases, the ward had died, so there was no possibility that the court's decision regarding the extent of his or her rights would affect the ward. See, e.g., Eichner, 426 N.Y.S.2d at 523 ("In assessing our obligations at this point, we recognize that, because the profound and difficult issues which underlie this proceeding transcend the tragedy which befell Brother Fox, they have not perished with him.”). Similarly, any interest the guardians may have had in these cases also ended with the ward's death. See, e.g., Wis. Stat. § 54.64(3) (2014) ("A guardianship of the person shall terminate if ... the ward dies.”). Nonetheless, the courts relied on discretionary exceptions to their mootness doctrines, rather than any continuing interest the ward may have, to exercise jurisdiction. See, e.g., Rasmussen by Mitchell, 741 P.2d at 680 ("This particular controversy became moot when Rasmussen died. We have discretion, however, to decide questions which have become moot.”). Indeed, courts have chosen to exercise jurisdiction in almost every case that has arisen in the compelling context presented here, where a ward has died and the authority of the guardian to remove the ward from life-sustaining treatment is challenged. See id. at 681 ("Other jurisdictions have declined to rely on the death of the real party in interest and the mootness doctrine to avoid resolving issues raised in medical treatment cases. We follow in their footsteps and exercise our jurisdiction to confront the issues and reach the merits of this case."). The one exception that the dissent cites — In re Riddlemoser, 317 Md.
496, 564 A.2d 812 (1989) — is inapposite. In Riddlemoser, the court first acknowledges that it has the authority to hear technically moot cases in "rare instances which demonstrate the most compelling of circumstances.” Id. at 815 (citation omitted) (internal quotation marks omitted). But the court then declines to exercise its jurisdiction, because the ward’s attorney, her guardians, and all the amici were "of one mind” on the statutory interpretation issue and all agreed that courts had the ability under the Maryland statute to order the withholding or withdrawal of medical treatment. Id. at 816. In other words, in Riddlemoser, there was "no party presenting a contrary argument” on the statutory issue. Id. We are not faced with similar agreement between the attorney for the ward, the guardian, and the amici before us in this case.

. We are not alone in recognizing that we have authority to decide cases that might be technically moot as long as those cases present issues of significant public interest. The jurisprudence of 42 other states recognizes similar exceptions to the mootness doctrine, although the specific requirements of the exceptions vaty from state to state. See City of Birmingham v. Long, 339 So.2d 1021, 1023 (Ala.1976); Hayes v. Chamey, 693 P.2d 831, 834 (Alaska 1985); Wise v. First Nat’l Bank, 49 Ariz. 146, 65 P.2d 1154, 1156 (1937); Campbell v. State, 311 Ark. 641, 846 S.W.2d 639, 640 (1993); Liberty Mut. Ins. Co. v. Fa-les, 8 Cal.3d 712, 106 Cal.Rptr. 21, 505 P.2d 213, 215 (1973); Humphrey v. Sw. Dev. Co., 734 P.2d 637, 639 (Colo.1987); McDermott Inc. v. Lewis, 531 A.2d 206, 211 (Del.1987); Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla. 1984); United Pub. Workers v. Yogi, 101 Hawaii 46, 62 P.3d 189, 204 (2002); Idaho Sch. for Equal Educ. Opportunity v. State Bd. of Educ., 128 Idaho 276, 912 P.2d 644, 652 (1996); People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E.2d 769, 772 (1952); Ind. Educ. Employment Relations Bd. v. Mill Creek Classroom Teachers Ass’n, 456 N.E.2d 709, *737 712 (Ind.1983); Rush V. Ray, 332 N.W.2d 325, 326 (Iowa 1983); Smith v- Martens, 279 Kan. 242, 106 P.3d 28, 32 (2005); grown v. Baumer, 301 Ky. 315, 191 S.W.2d 235, 238 (1946); Campaign for Sensible Transp. v. Me. Tpk. Auth., 658 A.2d 213, 215 (Me.1995); Attorney Gen. v. Anne Arundel Cnty. Sch. Bus Contractors Ass’n, Inc., 286 Md. 324, 407 A.2d 749, 752 (1979); Lockhart v. Attorney Gen., 390 Mass. 780, 459 N.E.2d 813, 815 (1984); Mead v. Batchlor, 435 Mich. 480, 460 N.W.2d 493, 496 (1990), abrogated on different grounds by Turner y. Rógers, - U.S. -, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011); All-red v. Webb, 641 So.2d 1218, 1220 (Miss. 1994); In re Marshall, 478 S.W.2d 1, 5 (Mo. 1972); State ex rel. Ronish v. Sch. Dist. No. 1 of Fergus Cnty., 136 Mont. 453, 348 P.2d 797, 800 (1960); Chambers v. Lauteribaugh, 263 Neb. 920, 644 N.W.2d 540, 547 (20Q2); State v. Glusman, 98 Nev. 412, 651 P.2d 639, 643 (1982); State v. Swift, 101 N.H. 340, 143 A.2d 114, 116 (1958); State v. Perricone, 37 N.J. 463, 181 A.2d 751, 755 (1962); Mowrer v. Rusk, 95 N.M. 48, 618 P.2d 886, 889 (1980); Nat’l Org. for Women v. State Div. of Human Rights, 34 N.Y.2d 416, 358 Ñ.Y.S.2d 124, 314 N.E.2d 867, 869 (1974); N.C. State Bar v. Randolph, 325 N.C. 699, 386 S.E.2d 185, 186 (1989); Walker v. Schneider, All N.W.2d 167, 169-70 (N.D.1991); Franchise Developers, Inc. v. City of Cincinnati, 30 Ohio St.3d 28, 505 N.E.2d 966, 969 (1987); Payne v. Jones, 193 Okla. 609, Í46 P.2d 113, 116 (1944); Sagan ex rel. Registered Voters of the Commonwealth v. Pa. Pub. Television Network, 518 Pa. 564, 544 A.2d 1309, 1310 n. 2 (1988); In re New England Gas Co., 842 A.2d 545, 554 (R.I.2004); Sloan v. Friends of Hunley, Inc., 369 S.C. 20, 630 S.E.2<d 474, 478 (2006); Anderson v. Kennedy, 264 N.W.2d 714, 717 (S.D.1978); McCanless v. Klein, 182 Tenn. 631, 188 S.W.2d 745, 747 (1945); Utah Transit Auth. v. Local 382 of Amalgamated Transit Union, 289 P.3d 582, 589-90 (Utah 2012); Sorenson v. City of Bellingham, 80 Wash.2d 547, 496 P.2d 512, 518 (1972); Israel ex rel. Israel v. W. Va. Secondary Sch. Activities Comm’n, 182 W.Va. 454, 388 S.E.2d 480, 483 (1989); In re Recall of Certain Officials of Delafield, 63 Wis.2d 362, 217 N.W.2d 277, 279 (1974); In re RM, 102 P.3d 868, 871 (Wyo.2004).
Justice Stras's dissent attempts to discount the overwhelming weight of this support for our decision to exercise our discretion to resolve this case as an exception to the mootness doctrine by arguing — without citation to any authority — that these cases are distinguishable because the constitutions in these states do not have separation of powers provisions. The dissent’s lack of citation is not surprising. In fact, all of these states recognize separation of powers principles similar to those reflected in the Minnesota Constitution, most due to express provisions in their constitutions. Ala. Const, art. Ill, §§ 42-43; Ariz. Const, art. Ill; Ark. Const, art. IV, §§ 1-2; Cal. Const, art. Ill, § 3; Fla. Const, art. II, § 3; Idaho Const, art. II, § 1; Ill. Const, art. II, § 1; Ind. Const, art. Ill, § 1; Iowa Const, art. Ill, § 1; Ky. Const. § 28; Me. Const, art III, §§ 1-2; Mass. Const, pt.l, artXXX; Mich. Const, art. Ill, § 2; Miss. Const, art. I, §§ 1-2; Mo. Const, art II, § 1; Mont. Const, art. Ill, § 1; Neb. Const, art II, § 1; Nev. Const, art. Ill, § 1; N.H. Const, pt.l, art. 37; N.J. Const, art. Ill, ¶ 1; N.M. Const, art. Ill, § 1; N.C. Const, art. I, § 6; N.D. Const, art. XI, § 26; Okla. Const, art. IV, § 1; R.I. Const, art. V; S.C. Const, art. I, § 8; S.D. Const, art. II; Tenn. Const, art. II, §§ 1-2; Utah Const, art. V, § 1; W. Va. Const, art. V, § 1; State, Dep’t of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc., 28 P.3d 904, 913 (Alaska 2001) ("The separation of powers doctrine and its complementary doctrine of checks and balances are implicit in the Alaska Constitution.”); Haw. Insurers Council v. Lin-gle, 120 Hawai'i 51, 201 P.3d 564, 582-83 (2008) ("The separation of powers doctrine is not expressly set forth in any single constitutional provision ... [but Hawaii’s sovereign power] is divided and allocated among three co-equal branches. The doctrine provides that a department may not exercise powers not so constitutionally granted, which from their essential nature, do not fall within its division of governmental functions, unless such powers are properly incidental to the performance by it of its own appropriate functions.” (citations omitted) (internal quotation marks omitted)); State ex rel. Morrison v. Sebelius, 285 Kan. 875, 179 P.3d 366, 374 (2008) ("The separation of powers doctrine is not expressly stated in either the United States or Kansas Constitutions. Yet, the doctrine is recognized as an inherent and integral element of the republican form of government.” (citation omitted) (internal quotation marks omitted)); Clark v. Cuomo, 66 N.Y.2d 185, 495 N.Y.S.2d 936, 486 N.E.2d 794, 797 (1985) ("The doctrine of separation of powers is implied by the separate grants of power to each of the coordinate branches of government.”); City of S. Euclid v. Jemison, 28 Ohio St.3d 157, 503 N.E.2d 136, 138 (1986) ("While Ohio, unlike other jurisdictions, does *738 not have a constitutional provision specifying the concept of separation of powers, this doctrine is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government.” (citations omitted) (internal quotation marks omitted)); Jefferson Cnty. Court Appointed Empys’ Ass’n v. Pa. Labor Relations Bd., 603 Pa. 482, 985 A.2d 697, 706 (2009) (”[T]o maintain the independence of the three branches of government, our system embodies a separation of powers.”); Hale v. Wellpinit Sch. Dist. No. 49, 165 Wash.2d 494, 198 P.3d 1021, 1025-26 (2009) (“Separation of powers create[s] a clear division of functions among each branch of government, and the power to interfere with the exercise of another’s functions [is] very limited ... The principle of separation of powers was incorporated into the Washington State Constitution in 1889.”); State ex rel. Friedrich v. Circuit Court for Dane Cnty., 192 Wis.2d 1, 531 N.W.2d 32, 36 (1995) ("The doctrine of separation of powers, while not explicitly set forth in the Wisconsin constitution, is implicit in the division of governmental powers among the judicial, legislative and executive branches.”). The dissent also argues that the cases are distinguishable because some jurisdictions authorize their judiciary to issue advisory opinions. Only seven of the 42 states provide in their constitutions that the judiciary may issue advisory opinions. See Fla. Const, art. V, § 3; Me. Const, art. VI, § 3; Mass. Const, pt. 2, ch. 3, art. 2; Mich. Const, art. Ill, § 8; N.H. Const, pt. 2, art. 74; R.I. Const, art 10, § 3; S.D. Const, art. V, § 5. The absence of this authority in Minnesota is not relevant to this case, however, because, as explained above, the district court did not issue an advisory opinion.

. Justice Stras's dissent accuses that we "aggrandize” our power. The dissent is wrong. We ground our decision in our precedent, as is our obligation. The dissent’s apparent disagreement with our precedent that recognizes and applies exceptions to the mootness doctrine does not provide a basis for us to ignore that precedent. Indeed, even one of the cases the dissent cites recognizes that we have the authority to decide moot issues as an exception to the mootness doctrine. In re Schmidt, 443 N.W.2d 824, 826 (Minn. 1989). The authority is well recognized in our cases and, unlike the dissent, we are not willing to discard it. To be sure, the dissent attempts to distinguish Rud, Jasper and Matthews, because, according to the dissent, the district courts in those cases did not issue advisory opinions. But this distinction is nonexistent because the district court in this case did not issue an advisory opinion. The other cases that the dissent discusses are likewise not helpful to the analysis here because these cases do not discuss or apply the exceptions we have recognized to our mootness doctrine. See Sinn v. City of St. Cloud, 295 Minn. 532, 203 N.W.2d 365 (1972); Doyle v. Ries, 205 Minn. 82, 285 N.W. 480 (1939); Works v. Tiber, 169 Minn. 172, 210 N.W. 877 (1926); In re Application of the Senate, 10 Minn. 78 (Gil.56) (1865). The question presented here is not whether the statutory interpretation issue raised in the case is moot because Tschumy has died. The question instead is whether we should exercise our discretion to take jurisdiction to decide the issue under one of our well-recognized exceptions to the moótness doctrine.

. Parens patriae is defined as “the state in its capacity as provider of protection to those unable to care for themselves.” It translates from Latin as "parent of his or her country.” Black’s Law Dictionary 1287 (10th ed.2014).

. Justice Stras’s disselit acknowledges that the statutory interpretation issue presented in this case is a "legal issue with státeWide importance.” The dissent nevertheless blusters that we are behaving as a “junior varsity legislature” because we are "making a pure policy decision” that "ignores the fundamental limitations on oür authority." interpreting statutes, however, is work the judicial branch has been doing since our State was founded. See, e.g., Olson v. Nelson, 3 Minn. 53 (Gil.22) (1859). And ⅛ doing thjs work of statutory interpretation, we do not make public policy; we attempt to interpret the policy that the Legislature has already determined in the statutory language at isstte. See, e.g., Hae-fele v. Haefele, 837 N.W.2d 703, 708 (Minn. 2013) (“The purpose of all statutory interpretation is to ascertain and effectuate the intention of the Legislature.”). We do nothing more in this case.

. The court of appeals, while recognizing that this case "involves an important public issue of statewide significance,” felied on the exception to our mootness jurisprudence that allows courts to hear cases that are capable of repetition, yet evade review. In re Guardianship of Tschumy, A12-2179, Order at 4 (Minn. App. filed Feb. 20, 2013). In holding that we have jurisdiction to hear this case, however, we do not rely on the "capable of repetition, yet evading review” exception. Rather, we rely on the separate exception that allows us to hear cases that are functionally justiciable and present important public issues of statewide significance. See Kahn v. Griffin, 701 N.W.2d 815, 821-22 (Minn.2005) (discussing "capable of repetition, yet evading review” and "functionally justiciable and ... an important public issue of statewide significance” as two separate exceptions to our mootness jurisprudence (citations omitted) (internal quotation marks omitted)).
Justice Stras’s dissent mistakenly refers to this portion of the opinion as a "plurality.” Four members of the court agree that we have jurisdiction to decide the statutory interpretation question presented in this case. Accordingly, the jurisdiction section of this opinion is the opinion of the court, not of a plurality.

. Tschumy also argues, in the alternative, that if we were to conclude that Minn.Stat. § 524.5-313(c)(4)(i) is ambiguous, various canons of statutory construction and relevant legislative history support his contention that court approval was required to discontinue his life-sustaining treatment. Because we conclude, as set forth below, that the plain language of the statute gives the guardian authority to consent to the discontinuation of Tschumy’s life-sustaining treatment, we do not reach these alternative arguments.

. The statute at the time used the term "conservator” as well as “guardian,” but Torres’s use of the word "conservator” is synonymous with the use of the word "guardian” in today's statute. Compare Minn.Stat. § 525.56, subd. 2 (1982) ("The cobrt shall grant to a guardian or conservator dply those powers necessary to provide for the demonstrated needs of the ward or conservatee.”), with Minn.Stat. § 524.5-313(b) (2012) ("The court shall grant to a guardian only those powers necessary to provide for the demonstrated needs of the ward.”).

. Consider, for example, a guardian who is appointed for a ward who has developmental disabilities and is therefore unable to make medical decisions for herself or meet her medical needs but who has no other medical conditions. Under Tschumy's position, a guardian given the medical-consent power for this ward would be able to make medical decisions related only to the ward’s development disabilities. If the ward later developed cancer or broke her leg, the guardian would need to get a court order to make medical decisions for these conditions as well.

. Due process protections provided under the Minnesota Constitution are "identical” to the due process guaranteed under the U.S. Constitution. Sartori v. Hamischfeger Corp., 432 N.W.2d 448, 453 (Minn. 1988).

. When a due process violation is alleged, a court must first determine whether the asserted violation was caused by state action. State v. Beecroft, 813 N.W.2d 814, 837 (Minn.2012). The State appoints guardians as a function of its parens patriae power to protect "infants and other persons lacking the physical and mental capacity to protect themselves.” In re Pratt, 219 Minn. 414, 422, 18 N.W.2d 147, 152 (1945). Traditionally, the State delegates the performance of this relationship via the guardianship statutes. Id. at 422, 18 N.W.2d at 152; see also Thomas S. v. Morrow, 781 F.2d 367, 377-78 (4th Cir.1986) (finding that a guardian was a "state actor” for purposes of a federal civil rights lawsuit under 42 U.S.C. § 1983 because the guardian "acted together with or has obtained significant aid from state officials”); In re Guardianship of L.W., 167 Wis.2d 53, 482 N.W.2d 60, 71 (1992) (recognizing that a guardian is a state actor because a guardian’s authority "derives from the state's parens patriae power and is purely statutory").