HUBBARD BROADCASTING, INC.,
d.b.a. KSTP–TV, KSTP–AM, Inc.,
and KSTP–FM, Inc., Respondents,

v.

METROPOLITAN SPORTS FACILITIES
COMMISSION, a public body, Ameri-
can Sign and Indicator Corporation
and Twin City Federal Savings & Loan
Association, et al., Appellants.

No. C3–85–1517.

Supreme Court of Minnesota.

Feb. 14, 1986.

Wayne H. Olson, David R. Knodell, Michelle J. Ulrich, Minneapolis, for appellants.

Sidney Barrows, Robert Lewis Barrows, Mary Benjamin Trevor, Minneapolis, for respondent.

SCOTT, Justice.

This case involves two questions certified to this court by the United States Court of Appeals for the Eighth Circuit pursuant to Minn.Stat. § 480.061 (1984). The certified questions arise from an action commenced by Hubbard Broadcasting, Inc. (Hubbard), in federal district court, challenging a scoreboard agreement for the Hubert H. Humphrey Metrodome (Metrodome) executed by the Metropolitan Sports Facilities Commission (Commission) and American Sign and Indicator Corp. (American Sign). The questions are as follows:

(1) Whether the Scoreboard System Agreement is a contract for supplies, materials or equipment within the meaning of the public bidding statutes, Minn.Stat. Ann. §§ 471.345, 473.556, and, if so, whether the Scoreboard System Agreement is nonetheless not subject to the public bidding requirement because it falls within the exception provided in Minn.Stat.Ann. § 473.556(7).

(2) Whether the Commission pursuant to Minn.Stat.Ann. § 473.556 had the authority to sell or lease advertising in the Metrodome on an exclusive basis and, if so, whether the Commission unlawfully delegated its authority to sell or lease advertising within the Metrodome by entering into the Scoreboard System Agreement with ASI–TCF without establishing any standards or policies.

*Hubbard Broadcasting, Inc., v. Metropolitan Sports Facilities Commission,* Nos. 85–5006, –5011, –5014 (8th Cir. August 8, 1985).

Pursuant to the Minnesota Sports Facilities Act (codified at Minn.Stat. §§ 473.-551–.596 (1984)), the Metropolitan Sports Facilities Commission was established to study, construct, own and operate a metropolitan sports facility. In studying the feasibility of constructing a new facility in 1977 and 1978, the Commission discussed some of the possible features of a new stadium and agreed, at that time, that if a "domed stadium" were built, a "state-of-the-art" scoreboard system, with instant replay capabilities, would be necessary. In December 1978, the Commission voted to construct a domed stadium in Minneapolis and thereafter entered into use agreements with the two major-league professional sports teams in the area.[1] These agreements required that a scoreboard system be installed in the new stadium.

During this period the executive director of the Commission, Donald Poss, discussed with managers of other sports facilities the arrangements they had entered into with scoreboard manufacturers. From his investigation Poss determined that typically a scoreboard manufacturer would provide a scoreboard system in return for revenues from the advertising displayed on the scoreboard. Poss learned that there were two major manufacturers of scoreboard systems that had entered into such arrangements with sports facility authorities, American Sign and Steward-Warner Corp.

---

1. For a recital of the history of the Metrodome, see *Lifteau v. Metropolitan Sports Facilities Commission,* 270 N.W.2d 749 (Minn.1978).

These two manufacturers had supplied most of the modern major-league scoreboards in the country.

In January, 1978, Poss talked to a representative of American Sign, James Turner, who expressed interest in manufacturing a scoreboard system for the Metrodome. On November 29, 1978, American Sign, in joint venture with Twin City Federal Savings & Loan Association (Twin City Federal), submitted a written proposal to the Commission. The proposal provided that American Sign would supply a scoreboard system in return for advertising rights and that advertising on the scoreboard would be sold to advertisers on an exclusive basis for each product category.[2] On January 16, 1979, Turner sent Poss a summary of scoreboard agreements entered into by 10 sports facility authorities throughout the country. The typical agreement was for a term of 10 years, with the manufacturer retaining title to the scoreboard and all advertising revenue during the term. The stadium authority typically provided the maintenance, electricity and control room. Turner met with the architect of the Metrodome in June, 1979, to review the design of the proposed scoreboard system and to ensure that the Metrodome could accommodate the type of scoreboard system proposed.

In mid-1979, a representative from Stewart-Warner Corp. contacted Poss to express interest in manufacturing a scoreboard system for the Metrodome. Stewart-Warner formed a joint venture with Midwest Federal Savings & Loan Association (Midwest Federal) in order to receive financial backing for the project. Thereafter, Stewart-Warner submitted a written proposal to the Commission, detailing the arrangement for the installation of a scoreboard system. In late 1980, Poss was approached by representatives of the Minnesota Vikings and Diamond Vision, another scoreboard manufacturer, concerning possible installation of a color scoreboard system in the Metro-

dome. However, no formal proposal was submitted to the Commission. Thus, by late 1980 the Commission had before it two formal scoreboard proposals.

During 1980 the stadium architect studied the two scoreboard proposals and, on January 5, 1981, concluded in a report to Poss that although the proposed systems were of similar quality American Sign's system was preferred because it provided more visual information to the spectators and had fewer advertising panels.

Thereafter, Poss submitted to the Commission a financial report of the two proposals. He noted that Stewart-Warner's proposal guaranteed the Commission $75,000 a year for the first 5 years of the agreement, $100,000 a year for the second 5-year period, and $125,000 for the third 5-year period. If there were any annual revenues left after Stewart-Warner paid amortization and operating expenses, the Commission would receive a 90-percent split of the excess revenues. Stewart-Warner would own the scoreboard during the 15-year term of the agreement. In its proposal, American Sign guaranteed to the Commission that the amount of advertising revenues used for amortization and operating expenses would not exceed $500,000 each year for the first 10 years of the term. The Commission would receive 75 percent of all revenues in excess of the $500,000. In the third 5-year period, the Commission would be responsible for the operating expenses, but would receive all the advertising revenues.

The Commission studied the reports during January, 1981, and was to vote for one of the scoreboard systems by January 28, 1981, in order to allow enough time for the system to be installed and operational before the Minnesota Twins' opening game in April, 1982. On January 20, 1981, however, Midwest Federal, which formed a joint venture with Stewart-Warner for the purposes of financing the scoreboard system, informed the Commission that it was

**2.** Under this proposal, product categories are established and once a maker of a certain product commits to advertising its product, no maker of a competing product is allowed to use the scoreboard for advertising.

withdrawing the Stewart-Warner/Midwest Federal proposal, citing delays in obtaining the Commission's decision and changing economic conditions. Stewart-Warner requested that the Commission postpone its decision on the scoreboard until Stewart-Warner could establish a different joint venture. Concerned that the scoreboard would not be operational in April, 1982, Poss refused to postpone the Commission's consideration of scoreboard proposals. On January 28, 1981, the Commission voted to accept the proposal submitted by American Sign and executed an agreement.

The Scoreboard System Agreement executed by American Sign and the Commission incorporated, for the most part, the provisions of the proposal submitted earlier by American Sign. Under the agreement, for the first 10 years of the 15-year period, American Sign retains the first $500,000 of net revenues from advertising exhibited on the scoreboard. Any net advertising revenues over and above $500,000 per year are divided 75 percent to the Commission and 25 percent to American Sign. During the final 5 years of the agreement, all advertising revenues revert to the Commission. American Sign holds title to the scoreboard system until the 15-year period expires, when title automatically passes to the Commission. The agreement gives American Sign the exclusive right to "construct, install and maintain" a scoreboard in the Metrodome and allows American Sign "to sell and contract for" advertising that is exhibited on the scoreboard system.

After the execution of the scoreboard agreement American Sign began contacting national and local advertisers concerning available space on its scoreboard system. In the early spring of 1982, American Sign representative Turner contacted both Hubbard (KSTP) and Midwest Radio and Television, Inc. (WCCO) to advise them that advertising space was available in the Metrodome and that he would be in Minneapolis on March 2, 1982, to solicit advertisers. Upon arriving in Minneapolis, Turner had lunch with WCCO executives and presented several alternative advertising packages. He sold a basic advertising package to WCCO on that date on an "exclusive by-product-category basis." Because WCCO now had the exclusive right to advertise in the Metrodome in the "broadcast" category, Turner did not contact Hubbard (KSTP).

Shortly after March 2, 1982, Turner informed Hubbard that the advertising for the broadcast category had already been sold to WCCO. On March 25, 1982, Hubbard contacted the Commission, American Sign and Twin City Federal, demanding that it be allowed to advertise in the Metrodome. In July 1982, American Sign formalized with WCCO the advertising contract, which provided that WCCO reserved the right to terminate the contract if any competing broadcaster's advertisement was displayed in the Metrodome.

On September 30, 1982, Hubbard brought suit in federal district court, alleging deprivation of free speech and equal protection, and violation of the Sherman Antitrust Act. Seven other counts were alleged. Four were state-law versions of the federal claims, one was a third antitrust violation, and two were allegations that the state public bidding statute, Minn. Stat. § 471.345 (1984), had been violated and that there was an unlawful delegation of the Commission's authority to American Sign.

In several pretrial orders the district court granted American Sign's motions for summary judgment on the first amendment and equal protection claims. It also dismissed the unlawful delegation claim, ruling that the Commission provided appropriate standards for the sale of advertising and reserved the right to control the types of ads appearing on the scoreboard. The court further ruled that the scoreboard agreement executed by the Commission and American Sign violated the public bidding statute and accordingly declared the agreement void. American Sign appealed to the United States Court of Appeals for the Eighth Circuit, contending that the district court erred in ruling that the agreement violated the state public bidding stat-

ute. Hubbard cross-appealed, arguing that the district court improperly dismissed its first amendment, equal protection and unlawful delegation claims. The Eighth Circuit Court then certified the two questions mentioned above to this court.

1. Whether the Scoreboard System Agreement is a contract for supplies, materials or equipment within the meaning of the public bidding statutes, Minn.Stat. Ann. §§ 471.345, 473.556, and, if so, whether the Scoreboard System Agreement is nonetheless not subject to the public bidding requirement because it falls within the exception provided in Minn.Stat.Ann. § 473.556(7).

The powers of the Metropolitan Sports Facilities Commission are enumerated in the 1977 Act establishing the public commission, Minn.Stat. §473.551–.595 (1984). Exclusive of the specific powers defined in the statute, the legislature granted the Commission "all powers necessary or convenient to discharge the duties imposed by law, including but not limited to those specified in this section." Minn.Stat. § 473.-556, subd. 1 (1984). Subdivision 7 of section 473.556 provides, in part: "The commission may contract for materials, supplies, and equipment in accordance with section 471.345 [the public bidding statute] * * *." The Commission and American Sign argue that the scoreboard system agreement is not a contract for materials, supplies or equipment within the meaning of that provision. Thus, they conclude, the Commission was not required to follow the public bidding procedures of Minn.Stat. § 471.345.

■ It appears that the legislature did limit the applicability of the public bidding statute to contracts that the Commission executed for materials, supplies or equipment. In section 473.556, the legislature listed the specific powers of the Commission, powers that include the ability to accept gifts and grants, the ability to execute contracts for services and the ability to enter into use agreements. Only in subdivision 7 of the section, entitled "contracts," wherein the legislature discusses the abili-

ty of the Commission to contract for materials, supplies and equipment, does a reference to the public bidding statute appear. Therefore, the Commission was required to follow the public bidding procedure only in executing contracts for materials, supplies or equipment for the Metrodome.

■ The scoreboard system agreement entered into by the Commission and American Sign is more than a contract for merely materials, supplies or equipment. Although the agreement states that the purpose of the contract is to "supply a Scoreboard System for the use of the Commission," under the agreement the Commission grants more rights and takes on more responsibilities than those required in typical contracts for materials or equipment. The agreement gives American Sign "the right to sell and contract for advertising which is to be exhibited on the Scoreboard System." In the agreement the Commission specifically retains the right to review the advertising and to control the dates and times it is displayed. American Sign has title to the system itself for 15 years and is responsible, for 10 years, for all the maintenance and the electricity the system uses. The Commission agrees to "use its best efforts to cause" the concessionaire at the Metrodome to stock the products being advertised on the scoreboard system. The allocation of the revenue generated from the advertisements appearing on the scoreboard system is also determined with specificity in the agreement. Many of the features of the agreement are simply beyond any fair meaning of "contracts for materials, supplies and equipment" within the statute.

We have recognized that public bidding provisions are to be construed narrowly. In *R.E. Short Co. v. Minneapolis*, 269 N.W.2d 331, 342 n. 11 (Minn.1978), we noted that the public bidding statute is restrictive and should not be extended to contracts not envisioned by the legislature. In *Griswold v. Ramsey County*, 242 Minn. 529, 534, 65 N.W.2d 647, 651 (1954), we stated:

In the absence of a controlling constitutional, statutory, or character provision, it is generally held that public policy does not demand that a municipal corporation about to enter into a contract for the construction of a public improvement must advertise for bids and let the contract to the lowest responsible bidder. Commentators have also recognized that competitive bidding is not an essential prerequisite to the enforceability of public contracts and that competitive bidding statutes should be interpreted narrowly. One authoritative text notes:

These [competitive bidding] provisions are strictly construed by the courts, and will not be extended beyond their reasonable purport. Such provisions must be read in the light of the reason for their enactment, lest they be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way.

10 E. McQuillin, Municipal Corporations § 29.29 (3rd ed. 1981) (citations omitted). This principle of narrow construction requires that the contract being challenged must unambiguously fall within the language of the public bidding statute. The contract at issue here does not.

We therefore hold that the scoreboard system agreement is not a contract for supplies, materials or equipment within the meaning of Minn.Stat. § 473.556, subd. 7, and determine that the Commission did not violate the public bidding statute, Minn. Stat. § 471.345, in entering into the agreement with American Sign.

2. Whether the Commission pursuant to Minn.Stat.Ann. § 473.556 had the authority to sell or lease advertising in the Metrodome on an exclusive basis and, if so, whether the Commission unlawfully delegated its authority to sell or lease advertising within the Metrodome by entering into the Scoreboard System Agreement with ASI–TCF without establishing any standards or policies.

■ Hubbard argues that the Commission is not authorized under Minn.Stat. § 473.556 to sell or lease advertising in the Metrodome on an exclusive basis. The statutory provision, however, is a broad grant of power. The statute provides that the Commission "may acquire by lease, purchase, gift, or devise all necessary right, title, and interest in and to real or personal property deemed necessary to the purposes contemplated by [the act]." Minn.Stat. § 473.556, subd. 3. It may "equip, improve, operate, manage, maintain, and control the metropolitan sports area and sports facilities * * *." Minn. Stat. § 473.556, subd. 5. It may also "contract for materials, supplies, and equipment," "accept gifts of money, property, or services," and enter into agreements for "the use, occupation, and availability of part or all of any premises, property, or facilities under its ownership." Minn.Stat. § 473.556, subds. 7, 9, 12. In addition to these specific grants of power, the Commission has "all powers necessary or convenient to discharge the duties imposed by law * * *." Minn.Stat. § 473.556, subd. 1. The power of the Commission to sell or to lease advertising in the Metrodome was certainly contemplated by the legislature when it enumerated these broad powers, and nothing in the statutory grant of powers precludes the Commission from selling or leasing advertising on an exclusive basis.

■ The question then becomes whether the Commission unlawfully delegated its right to sell and lease exclusive advertising when it executed the scoreboard system agreement with American Sign. This situation does not present the classic nondelegation case. The question is not whether the legislature unlawfully delegated its powers to the Commission, but whether the Commission unlawfully delegated its powers to a private entity, American Sign. Nevertheless, the policy considerations that underlie the delegation doctrine are applicable here and the inquiry is the same: whether adequate legislative or administrative safeguards exist to protect against the injustice that results from uncontrolled discretionary power. See 1 K. Davis, Admin-

istrative Law Treatise §§ 3:12, 3:15 (2d ed. 1978); Jaffe, *Law Making by Private Groups*, 51 Harv.L.Rev. 201 (1937).

Sufficient safeguards exist. In the scoreboard agreement with American Sign the Commission retained the right to review all advertising appearing on the scoreboard. The applicable provision reads:

All advertising contracts secured by ASI–TCF shall be submitted to the Commission for review as to subject matter and copy of the advertising and as to dates and times of display. The Commission shall have the right to reasonably reject in writing any advertising so submitted and no such rejected advertising shall be displayed. Proposed advertisements shall be submitted for review no later than ten (10) business days prior to the event at which it is to be displayed; rejection of an advertisement shall be made no later than five (5) business days prior to the event. It shall be considered reasonable for the Commission to reject advertising which, by content or subject matter, is inimical to the best interests of the Commission and Stadium tenants or that a Stadium tenant reasonably believes may be offensive to the public, and to require that certain advertising subject matter not be displayed on the matrix panel during certain events at which such display would not be in keeping with the event, such as the advertising of alcoholic beverages during religious events.

The agreement also specifically provides that the Commission "retains the right to control the Scoreboard System matrix panel and to regulate the advertising and information being displayed thereon." Under the agreement the Commission has the "sole right" to determine the number, duration and frequency of times during an event when advertising sold by American Sign may be displayed on the Scoreboard System matrix panel.

Hubbard contends that because the Commission did not retain the right to choose which advertisers will have an exclusive privilege to advertise their products in the Metrodome, the Commission delegated its powers without any administrative safeguards. It appears, however, that the Commission only delegated a ministerial function to American Sign, for the Commission, in effect, approved the idea of exclusive advertising when the scoreboard agreement was executed, and merely granted American Sign the power to enter into such exclusive agreements with individual advertisers. The Commission, pursuant to the agreement, retained ultimate control over the advertisements appearing on the scoreboard—all proposed advertisements are submitted to the Commission and it specifically retained the right to reject any advertisement before it is displayed. Overall, sufficient safeguards are present.

Section 473.556 gives the Commission those powers necessary to operate a public sports facility. This statutory grant of power includes the authority to sell or to lease exclusive advertising rights in the facility and the power to grant to American Sign, a private entity, the duty to secure advertising contracts that will maximize revenue for it and the Commission to the extent reasonably practicable.

We therefore hold that the Commission had the authority to sell or lease advertising in the Metrodome on an exclusive basis and that it did not unlawfully delegate its powers to American Sign.

This opinion is submitted to the Clerk of the United States Court of Appeals for the Eighth Circuit pursuant to Minn.Stat. § 480.061.