STATE OF MINNESOTA

IN SUPREME COURT

A21-0626

Court of Appeals                                           Moore, III, J.
                                            Concurring, Anderson, J.
Drake Snell, et al.,                        Took no part, Procaccini, J.

            Appellants,

vs.                                                Filed: May 10, 2024
                                            Office of Appellate Courts
Tim Walz, Governor of Minnesota,
in his official capacity, et al.,

            Respondents.

_____


Douglas P. Seaton, James V. F. Dickey, Upper Midwest Law Center, Golden Valley, Minnesota, for appellants.

Keith Ellison, Attorney General, Liz Kramer, Solicitor General, Alec Sloan, Ayodele Famodu, Assistant Attorneys General, Saint Paul, Minnesota, for respondents.

Devin T. Driscoll, Mary Heath, Sarah Theisen, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for amicus curiae Minnesota Public Health Association.

_____

S Y L L A B U S

1.      The scope of the issues preserved for consideration here, under an exception to the mootness doctrine, permits the review of whether the Emergency Management Act, Minn. Stat. §§ 12.01–.61 (2022), can, in the abstract, authorize a sitting governor to declare a peacetime emergency for a pandemic, whether Governor Walz was specifically

1

authorized to declare a peacetime emergency in response to the COVID-19 pandemic, and whether the Act as a whole violates the nondelegation doctrine.

2.      The Emergency Management Act authorizes the declaration of a peacetime emergency in response to a pandemic and did not require the Governor to make an evidentiary showing that the Act's requirements were satisfied before declaring a peacetime emergency in response to the COVID-19 pandemic.

3.      The Emergency Management Act does not provide for an unconstitutional delegation of legislative authority under the Minnesota Constitution.

Affirmed.

O P I N I O N

MOORE, III, Justice.

We address here the narrow issue—preserved on remand to the court of appeals by our decision in *Snell v. Walz*, 985 N.W.2d 277 (Minn. 2023) (*Snell I*)—of whether the Emergency Management Act, Minn. Stat. §§ 12.01–.61 (2022), authorized Governor Walz to declare a peacetime emergency in response to the COVID-19 pandemic.  In *Snell I*, we determined that appellants' challenge to the Governor's peacetime emergency declaration was technically moot, given that the peacetime emergency had ended.  985 N.W.2d at 283. Nevertheless, we concluded that "[t]he question of whether the [Emergency Management] Act gives the Governor power to declare a peacetime emergency for a public health crisis is functionally justiciable and an important issue of statewide significance that should be decided immediately." *Id.* at 286.  We remanded the case and directed the court of appeals to consider the merits of Snell's claim that the Emergency Management Act "does not

2

allow the Governor to declare a peacetime emergency in response to the COVID-19 pandemic." *Id.* at 291.

On remand, the court of appeals concluded that the Emergency Management Act granted the Governor this authority and accordingly affirmed the district court's dismissal of the action. *Snell v. Walz*, 993 N.W.2d 669, 678 (Minn. App. 2023). We agree and affirm the decision of the court of appeals.

**FACTS**

The Emergency Management Act (the Act) confers upon the Governor of Minnesota the emergency and disaster powers to "(1) ensure that preparations of this state will be adequate to deal with disasters, (2) generally protect the public peace, health, and safety, and (3) preserve the lives and property of the people of the state." Minn. Stat. § 12.02, subd. 1. The Governor may declare a peacetime emergency "only when an act of nature, a technological failure or malfunction, a terrorist incident, an industrial accident, a hazardous materials accident, or a civil disturbance endangers life and property and local government resources are inadequate to handle the situation." Minn. Stat. § 12.31, subd. 2(a).[1]

---

[1]    In the 2023 legislative session, the Legislature amended the statute to provide: "A peacetime declaration of emergency may be declared only when any of the following endangers life and property and local government resources are inadequate to handle the situation: . . ." (the amended statute then numbers the existing situations that can trigger an emergency declaration and adds a new one: "cyber attack"). *See* Act of May 24, 2023, ch. 62, art. 6 § 4, 2023 Minn. Laws 2452, 2656 (codified as amended at Minn. Stat.§ 12.31, subd. 2(a) (2023)). The 2023 amendment does not alter the meaning of the text at issue here.

A peacetime emergency must not continue longer than 5 days "unless extended by resolution of the Executive Council up to 30 days."[2] *Id.* "By majority vote of each house of the legislature, the legislature may terminate a peacetime emergency extending beyond 30 days." *Id.*, subd. 2(b). Orders and rules promulgated pursuant to a peacetime emergency have the "full force and effect of law." Minn. Stat. § 12.32 (2022). "Rules and ordinances of any agency or political subdivision of the state inconsistent with [the Governor's emergency orders], is [sic] suspended during the period of time and to the extent that the emergency exists." *Id.*

On March 13, 2020, Governor Walz declared a peacetime emergency, citing the COVID-19 pandemic as an "act of nature" that "[l]ocal resources [were] inadequate to fully address." Emerg. Exec. Order No. 20-01, *Declaring a Peacetime Emergency and Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19* (Mar. 13, 2020). The order did not impose any restrictions on Minnesotans, but rather "encourage[d]" them to stay home when feeling sick and "urge[d]" them to follow guidance from the Minnesota Department of Health. *Id.*

In the months following the emergency declaration, the Governor issued several more orders in response to the COVID-19 pandemic, which greatly affected many aspects of daily life for Minnesotans. *See, e.g.*, Emerg. Exec. Order No. 20-02, *Authorizing and Directing the Commissioner of Education to Temporarily Close Schools to Plan for a Safe*

---

[2] The Executive Council is chaired by the Governor and also includes the Lieutenant Governor, the Secretary of State, the State Auditor, and the Attorney General. Minn. Stat. § 9.011, subd. 1 (2022).

4

*Educational Environment* (Mar. 15, 2020); Emerg. Exec. Order No. 20-04, *Providing for Temporary Closure of Bars, Restaurants, and Other Places of Public Accommodation* (Mar. 16, 2020); Emerg. Exec. Order No. 20-14, *Suspending Evictions and Writs of Recovery During the COVID-19 Peacetime Emergency* (Mar. 23, 2020); Emerg. Exec. Order No. 20-20, *Directing Minnesotans to Stay at Home* (Mar. 25, 2020); Emerg. Exec. Order No. 20-99, *Implementing a Four Week Dial Back on Certain Activities to Slow the Spread of COVID-19* (Nov. 18, 2020). One of these orders, the so-called "mask mandate," required Minnesotans to wear face coverings when indoors in businesses and public settings.[3] Emerg. Exec. Order No. 20-81, *Requiring Minnesotans to Wear a Face Covering in Certain Settings to Prevent the Spread of COVID-19* (July 22, 2020).

In August 2020, appellants Drake Snell and other individual Minnesotans (collectively, "Snell") filed a petition for a writ of quo warranto, challenging the legality of the Governor's mask mandate and emergency declaration on several grounds. Snell alleged and argued, among other things, that (1) a pandemic was incapable of damaging property as required under the Act; (2) the Governor provided no evidence that local government resources were inadequate to handle the pandemic, in contravention to the Act's supposed requirements; and (3) the Act was unconstitutional under the nondelegation doctrine because it delegated the Governor unrestrained lawmaking authority and allowed him to enforce a mask mandate that allegedly conflicted with state law. Snell requested

---

[3] The legality of this order or any of the other executive orders following the emergency declaration is not at issue here, as Snell's sole justiciable challenges are to the Governor's initial declaration of an emergency and to the Act itself.

that the district court enjoin the Governor from enforcing or issuing new emergency orders related to the COVID-19 pandemic.

The Governor moved to dismiss Snell's case for failure to state a claim upon which relief can be granted. The district court granted the Governor's motion to dismiss and denied Snell's petition. The district court concluded that the Act was a constitutional delegation of power to the Governor because it provided clear standards in its policy statement and placed strict limits on how long the Governor could exercise his emergency powers. It also concluded that the amended petition failed to plead sufficient facts "suggesting that local government resources as a whole [were] adequate" to handle the pandemic.

On May 6, 2021, roughly 7 weeks after the district court's order, the Governor issued an executive order announcing "plans for an eventual end to the face-covering mandate along with remaining business restrictions at a time when it is prudent." Emerg. Exec. Order No. 21-21, *Safely Sunsetting COVID-19 Public Health Restrictions* (May 6, 2021). On May 10, Snell filed his notice of appeal of the district court's order. On June 29, the Governor announced his intention to end the peacetime emergency on July 1. Press Release, *After Reaching Deal with USDA to Protect $45 Million in Hunger Relief, Governor Walz Announces Plan to End COVID-19 Emergency on July 1 While Ensuring an Orderly Transition* (June 29, 2021). On June 30, the Legislature approved a bill, which the Governor signed on the same day, to end the peacetime emergency on July 1. Act of June 30, 2021, ch. 12, art. 2, § 23, 2021 Minn. Laws 1st Spec. Sess. 2124, 2155.

Accordingly, the court of appeals dismissed Snell's appeal as moot. *Snell v. Walz*, A21-0626, 2021 WL 5764234, at \*5 (Minn. App. Dec. 6, 2021). Snell appealed, and we granted review. We concluded that most of Snell's claims were moot, but that one of his claims—that the Act does not give the Governor the power to declare a peacetime emergency for a pandemic—met an exception to the mootness doctrine because it was functionally justiciable and an issue of statewide importance. *Snell I*, 985 N.W.2d at 283, 286. We therefore reversed and remanded to the court of appeals to consider the merits of Snell's claim that the Act "does not allow the Governor to declare a peacetime emergency in response to the COVID-19 pandemic." *Id.* at 291. We affirmed the court of appeals as to Snell's other claims, which we concluded did not meet any of the exceptions for mootness. *Id.*

On remand, the court of appeals concluded that the Act "authorized the Governor to declare a peacetime emergency in response to the COVID-19 pandemic" and accordingly affirmed the district court's dismissal of the action. *Snell*, 993 N.W.2d at 678. The court of appeals declined to consider Snell's argument that the Act violated the nondelegation doctrine, holding that it was not within the scope of remand. *Id.* ("If the supreme court intended this court to address the constitutional issue that appellants raised before this court . . . the supreme court would have said so."). Snell again sought review from this court, which we granted.

7

**ANALYSIS**

Because the parties disagree on the issue presented here, we first address the scope of the issue we preserved for remand in *Snell I*. Next, we determine whether the Governor's actions fell within the Act's parameters. Finally, we consider Snell's argument that the Act itself is an unconstitutional violation of the nondelegation doctrine.

I.

At the outset, it is important to state what this case is about, and what it is not about. The sole remaining issue is Snell's claim that the Act did not allow the Governor to declare a peacetime emergency in response to the COVID-19 pandemic. This case is not about claims regarding the legality of any other executive order issued by the Governor during the COVID-19 pandemic, which we deemed moot without exception in Snell's first appeal to our court. That being so, the Governor frames the issue on appeal as "whether a public health crisis can *ever* satisfy the conditions of [the Act]." (Emphasis added.) Snell concedes that, under this formulation, such a crisis could satisfy the Act's conditions. Snell asks us, instead, to consider whether *this* Governor was authorized to declare a peacetime emergency for *this* public health crisis (the COVID-19 pandemic). In turn, the Governor asserts that Snell's concession as to the "pure legal question" that survived on remand resolves this case in the Governor's favor.

Snell and the Governor both point to our language in *Snell I* to support their competing contentions that the issue here should be framed either in the abstract (as a forward-looking legal question) or in relation to specific facts (by looking back on Governor Walz's actions during the COVID-19 pandemic). We interpret our previous

decisions de novo. *See State v. Obeta*, 796 N.W.2d 282, 288 (Minn. 2011).

In *Snell I*, we exercised our discretion to decide a case that was "technically moot" because it presented an issue that was functionally justiciable and of statewide importance. 985 N.W.2d at 280–81; *see also In re Guardianship of Tschumy*, 853 N.W.2d 728, 736 (Minn. 2014) ("[W]e have authority to decide cases that are technically moot when those cases are functionally justiciable and present important questions of statewide significance."). "A case is functionally justiciable if the record contains the raw material (including effective presentation of both sides of the issue raised) traditionally associated with effective judicial decision-making." *State v. Rud*, 359 N.W.2d 573, 576 (Minn. 1984). Here, we found that the question presented was functionally justiciable because "the issues [were] primarily legal and were well-briefed by the parties." *Snell I*, 985 N.W.2d at 284.

But we have never had occasion to delineate the bounds of appellate review for an issue that is technically moot, yet "functionally justiciable."[4] On one hand, excising the facts entirely from consideration here risks rendering our conclusion an advisory opinion.

---

[4] In most cases, the parties disagree not only on the specific application of the law to the facts, but also on the abstract legal question, so we have not needed to be conscious of how we framed the mooted issue in such cases. *See, e.g.*, *Rud*, 359 N.W.2d at 577–78 (disagreement over the abstract legal question of whether criminal defendants are permitted to call victims to testify at probable cause hearings for discovery purposes); *State v. Brooks*, 604 N.W.2d 345, 348 (Minn. 2000) (disagreement over the abstract legal question of whether the Minnesota Constitution permits cash only bail orders); *Tschumy*, 853 N.W.2d at 742 (disagreement over the abstract legal question of whether a guardian needs court approval to consent to the removal of life-sustaining treatment). Our task is more difficult here, where the parties essentially agree on the answer to the abstract legal question (depending on how it is formulated) and disagree primarily on the specific application of the law to the facts of a case that is technically moot.

9

On the other hand, deciding solely whether the Governor's specific conduct was authorized leaves the broader question of statewide importance unanswered. In the unique circumstances of this case, and given the importance of the issue we decide, we think the best approach is simply to answer both questions: in Part II.A., whether the Act can, in the abstract, authorize the declaration of a peacetime emergency for a public health crisis such as a pandemic, and in Part II.B., whether, specifically, Governor Walz was authorized by the Act to declare a peacetime emergency in response to the COVID-19 pandemic.

Finally, although the court of appeals concluded that the scope of our remand precluded consideration of whether the Act violates the nondelegation doctrine, *Snell*, 993 N.W.2d at 678, we find nothing in our previous opinion that prevents us from reaching this important question, which we address in Part III. Having therefore framed the issues for consideration on appeal, we proceed to review the text of the Act to discern the scope of authority it conferred on the Governor.

## II.

## A.

We first address the abstract legal question—whether the Act allows a governor to declare a peacetime emergency in response to a public health crisis such as a pandemic— to provide clarity on the matter. To qualify as a condition under which a governor could declare a peacetime emergency, a public health crisis such as a pandemic must fall under one of the categories enumerated in Minn. Stat. § 12.31, subd. 2(a). Snell does not dispute before our court that a pandemic qualifies as one of those categories, an "act of nature" under Minn. Stat. §12.31, subd. 2(a)(1), because it involves a mass spread of disease via

natural mechanisms.[5]

Additionally, to qualify for a peacetime declaration of emergency, a pandemic must "endanger[] life and property." Minn. Stat. § 12.31, subd. 2(a). Any pandemic that involves a deadly disease clearly endangers life. But a pandemic may also endanger property, as the population of healthy people necessary to make use of property is reduced or incapacitated. Snell argues that any endangerment of property that results from an emergency *response* (rather than endangerment caused by the act of nature *itself*) should not be considered here. We agree, but this focus does not change the fact that a pandemic— absent any response whatsoever—will still inevitably threaten property to the extent that it incapacitates or disincentivizes critical workforces.[6]

---

[5]    Snell argued at the court of appeals that a pandemic was not an "act of nature" justifying declaration of a peacetime emergency. In response, the court of appeals reiterated its analysis from *Hanson v. State*, No. A22-0884, 2023 WL 1943169, at *4 (Minn. App. Feb. 13, 2023), that the COVID-19 pandemic falls within the scope of the statutory phrase "act of nature." *Snell v. Walz*, 993 N.W.2d 669, 672–73 (Minn. App. 2023) (adopting the reasoning of *Hanson*). Snell does not argue before us that the court of appeals was wrong on this point.

[6]    In Nobles County, for example, thousands of hogs had to be euthanized after nearly 500 workers from the JBS pork-processing plant in Worthington contracted COVID-19, forcing the plant to cease normal operations. Adam Belz & Mike Hughlett, *10K Hogs Put Down Daily in State: Millions of Chickens Have Been Euthanized, too, with Turkeys Likely to Follow Suit*, Star Trib., May 6, 2020, at D1.
    And in Aitkin County, a rural hospital struggled to fill its labor needs—even resorting to $10,000 signing bonuses—as pandemic-induced burnout and high-paying travel positions drained healthcare workers from rural areas. Catharine Richert, *Minnesota Rural Hospital Workers Feel the Strain as Colleagues Leave, COVID Stays*, MPR News (Feb. 17, 2022, 4:00 AM), https://www.mprnews.org/story/2022/02/17/minnesota-rural-hospital-workers-feel-the-strain-as-colleagues-leave-covid-stays [opinion attachment].

11

Because a public health crisis such as a pandemic is capable of satisfying all[7] of the requirements set by the Legislature for declaring a peacetime emergency, we agree with the court of appeals and conclude that the Act authorizes a governor to declare a peacetime emergency in response to such an emergency.

B.

Yet even if the Act generally allows for the declaration of a peacetime emergency premised on a pandemic, was Governor Walz's emergency declaration authorized? Asserting that it was not, Snell argues that the conditions required for the Governor to declare a peacetime emergency must not only *exist*, but that the Governor must "show" or "demonstrate" the existence of these conditions before invoking his emergency powers.

Under the Act, the Governor of Minnesota may declare a peacetime emergency "*only* when": (1) "an act of nature"; (2) "endangers life and property"; and (3) "local government resources are inadequate to handle the situation." Minn. Stat. § 12.31, subd. 2(a) (emphasis added). Snell contends that use of the word "only" here is restrictive, and therefore it unambiguously signals that the Governor must make an antecedent evidentiary showing before invoking emergency powers.[8]

---

[7] Snell does not claim that a pandemic is incapable of creating scenarios in which local government resources may be inadequate to handle the situation. *See* Minn. Stat. § 12.31, subd. 2(a).

[8] The Governor contends that Snell forfeited his "antecedent evidentiary showing" argument by raising it for the first time on appeal. We agree, but we consider the argument nevertheless in the interest of justice, given our stated imperative to decide this issue now "so that any lack of clarity can be settled before it is necessary for a governor to invoke the Act again." *Snell I*, 985 N.W.2d at 285.

This is a question of statutory interpretation, which we review de novo. *State v. Riggs*, 865 N.W.2d 679, 682 (Minn. 2015). We interpret statutes "to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2022). The first step in statutory interpretation is determining whether the "statute's language, on its face, is clear or ambiguous." *Am. Fam. Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000). "The plain language of the statute controls when the meaning of the statute is unambiguous." *State v. Boecker*, 893 N.W.2d 348, 351 (Minn. 2017). But "[i]f the statutory language 'is subject to more than one reasonable interpretation,' it is ambiguous and we look to other interpretative tools to assist our inquiry into legislative intent." *Rodriguez v. State Farm Mut. Auto. Ins. Co.*, 931 N.W.2d 632, 634 (Minn. 2019) (quoting *Riggs*, 865 N.W.2d at 682). We construe statutory words and phrases "according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2022).

Snell is correct that the word "only" restricts the instances in which the Governor may declare a peacetime emergency to those described in the Act. We have previously looked to the dictionary definition of the word "only" as "[e]xclusively; solely" and concluded that the term restricts a statute to the words that follow it. *St. Matthews Church of God & Christ v. State Farm Fire & Cas. Co.*, 981 N.W.2d 760, 765 (Minn. 2022) (quoting *Only, The American Heritage Dictionary of the English Language* (New College ed. 1982)) (alteration in original) (internal quotation marks omitted). But just because the Governor cannot declare a peacetime emergency in the absence of the conditions described in the Act, it does not follow that he has the additional burden of demonstrating that those conditions are present before acting.

13

The statutory language here is clear on its face and unambiguous: the word "only" does nothing more than establish all three conditions as exclusive requirements. By authorizing an emergency declaration "only when" the requirements are met, the Legislature signaled that these conditions are both sufficient *and* necessary. Minn. Stat. § 12.31, subd. 2(a). That is, the statute authorizes the Governor to declare a peacetime emergency when all three conditions are satisfied, but under no other circumstances. Snell's argument is unpersuasive because it attempts to stretch these conditions into an evidentiary burden without pointing to any statutory language that implies such a burden. *See State v. Vue*, 797 N.W.2d 5, 17 (Minn. 2011) ("We will not read into a statute a requirement that the Legislature by its plain language has left out.").

Alternatively, Snell contends that requiring anything short of an evidentiary showing would give the Governor "unbridled discretion" (in violation of the nondelegation doctrine) and contravene the interpretive mandates of Minn. Stat. § 645.17(3) (2022) ("the legislature does not intend to violate the Constitution of the United States or of this state") and Minn. Stat. § 645.16(6) (the intention of the legislature may be ascertained by considering "the consequences of a particular interpretation"). But these interpretive directives referenced by *Snell* are canons of *construction*, which, generally, are "not available to override the plain language of a clear and unambiguous statute." *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 651 (Minn. 2012); *see also State v. Fugalli*, 967 N.W.2d 74, 79–80 (Minn. 2021) ("We do not apply constitutional avoidance statutory interpretation principles when . . . we have found a statute to be unambiguous."); *City of Circle Pines v. Cnty. of Anoka*, 977 N.W.2d 816, 825 (Minn. 2022) (stating that, when the

14

meaning of a statute "is not discernible based on the plain language, we may look to . . . the consequences of various interpretations"). Because the statutory language is unambiguous, the interpretive methods raised by Snell are not available here.[9]

Neither party disputes that the Act requires all three conditions to be present for the Governor to declare a peacetime emergency. Snell does not challenge whether these conditions existed, but only whether the Governor *demonstrated* their existence before acting. Because we conclude that the statute does not require such a demonstration, Snell's argument fails. Therefore, based on the record before us, Governor Walz was authorized under the Act to declare a peacetime emergency in response to the COVID-19 pandemic.

### III.

Snell raises one final concern in his appeal—that the Act violates the nondelegation doctrine because it places pure legislative power in the hands of the Governor with only illusory checks on the Governor's power once he declares a peacetime emergency. *See* Minn. Const. art III, § 1 ("The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments *shall exercise any of the powers properly belonging to either of the others* except in the instances expressly provided in this constitution." (emphasis added)). We are not persuaded by this contention.

Snell analogizes the Act to a similar authorizing statute in Michigan. The Michigan

---

[9]     Even so, we do not find Snell's nondelegation arguments convincing for reasons we explain in Part III of this opinion.

Supreme Court struck down that statute, concluding that its loose restrictions—that the governor "promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property"—permitted an unconstitutional delegation of legislative power.[10] *In re Certified Questions from U.S. Dist. Ct., W. Dist. of Mich., S. Div.*, 958 N.W.2d 1, 24 (Mich. 2020) (quoting Mich. Comp. Laws § 10.31(1) (2020)) (internal quotation marks omitted). With this in mind, we proceed to analyze Snell's claim and settle the important constitutional question of whether the Act violates the nondelegation doctrine.

## A.

We review de novo whether statutes are unconstitutional under separation of powers principles. *Reynolds v. State*, 888 N.W.2d 125, 131 (Minn. 2016). "Minnesota's statutes are presumed constitutional," *State v. Lee*, 976 N.W.2d 120, 125 (Minn. 2022), and we "will strike down a statute as unconstitutional only if absolutely necessary." *State v. Cox*, 798 N.W.2d 517, 519 (Minn. 2011).

In *Lee v. Delmont*, we stated that the Legislature "cannot delegate purely legislative power to any other body, person, board, or commission." 36 N.W.2d 530, 538 (Minn. 1949). We defined "pure legislative power" as "the authority to make a complete law— complete as to the time it shall take effect and as to whom it shall apply—and to determine the expediency of its enactment." *Id.* "Although discretion to determine when and upon

---

[10]     The Michigan and Minnesota Constitutions have functionally identical separation of powers clauses. *Compare* Mich. Const. art. III, § 2, *with* Minn. Const. art. III, § 1.

16

whom a law shall take effect may not be delegated," the Legislature may confer upon the executive "a discretionary power to ascertain, *under and pursuant to the law*, some fact or circumstance upon which the law by its own terms makes, or intends to make, its own action depend." *Id.*

The policy consideration underlying the nondelegation doctrine is "whether adequate legislative or administrative safeguards exist to protect against the injustice that results from uncontrolled discretionary power." *Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 381 N.W.2d 842, 847 (Minn. 1986). Yet the Legislature "may authorize others to do things which it might properly, but cannot conveniently or advantageously, do itself." *State ex rel. R.R. & Warehouse Comm'n v. Chi., Milwaukee & St. Paul Ry. Co.*, 37 N.W. 782, 787 (Minn. 1888), *rev'd on other grounds*, 134 U.S. 418 (1890). "If this was not permissible, the wheels of government would often be blocked, and the sovereign state find itself helplessly entangled in the meshes of its own constitution." *Id.*

Although the separation of powers is a critical piece of our constitutional infrastructure, we cannot blind ourselves to the need for some degree of flexibility when delineating the boundaries of each governmental branch. "[W]e must never forget that it is a *constitution* we are expounding . . . . intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 415 (1819); *see also Terminiello v. City of Chicago*, 337 U.S. 1, 14 (1949) (Jackson, J., dissenting) (admonishing that a court not "fix[] its eyes on a conception" of constitutional doctrine "so rigid as to tolerate no concession to

17

society's need for public order"). "[T]he Constitution," it has been said, "is not 'a suicide pact.' " *Ziglar v. Abbasi*, 582 U.S. 120, 179 (2017) (Breyer, J., dissenting) (quoting *Terminiello*, 337 U.S. at 37 (Jackson, J., dissenting)).

B.

We conclude that the Act does not represent an unconstitutional delegation of legislative authority. The limitations on the scope of powers delegated, the non-illusory checks on the executive's exercise of the delegated powers, and the material differences between this Act and other unconstitutional delegations of power all support our conclusion.

Part of the Legislature's sovereign power is the "authority to repeal or amend its own statutory enactments." *Kimberly-Clark Corp. & Subsidiaries v. Comm'r of Revenue*, 880 N.W.2d 844, 851 (Minn. 2016). Here, the Act allows the Governor's emergency orders to override the rules and ordinances of agencies or political subdivisions. Minn. Stat. § 12.32. It does not, however, grant the Governor the power to repeal or amend existing state statutes. Thus, at least part of the Legislature's power to make "complete law" is missing from the power delegated here. *Lee*, 36 N.W.2d at 538; *cf. Casey v. Lamont*, 258 A.3d 647, 664–65 (Conn. 2021) (holding that a governor's inability to repeal existing statutes demonstrated an adequate standard limiting the degree of delegated power). Therefore, the Act does not delegate to the Governor the ability to make complete law because some component of pure legislative power (the authority to repeal and amend) remains reserved by the Legislature. *See Lee*, 36 N.W.2d at 538.

We have also held that "close legislative monitoring" is an adequate check on the

18

broad delegation of legislative powers "in a complex and fast-changing area." *Minn. Energy & Econ. Dev. Auth. v. Printy*, 351 N.W.2d 319, 351 (Minn. 1984). The ability of the Legislature to monitor and terminate the peacetime emergency by a majority vote of both of its houses likewise offers a sufficient check on the broad powers necessary to respond to a complex and fast-changing emergency. Aside from Michigan, no other state court that has considered the statutory checks on an executive's emergency powers has found a violation of the nondelegation doctrine. *See, e.g.*, *State v. Riggin*, 959 N.W.2d 855, 862 (N.D. 2021) (emergency may be terminated by a concurrent resolution by the legislature); *Wolf v. Scarnati*, 233 A.3d 679, 706 (Pa. 2020) (emergency may be terminated by a concurrent resolution by the legislature and presentment to the governor); *Desrosiers v. Governor*, 158 N.E.3d 827, 841 (Mass. 2020) (legislature may nullify emergency orders by concurrent resolution); *Beshear v. Acree*, 615 S.W.3d 780, 811–12 (Ky. 2020) (legislature may end emergency if governor has not done so by the next regular session).

Likewise, we reject Snell's contention that the safeguards the Act places on the exercise of the Governor's emergency powers are illusory. Snell claims that requiring a majority vote by each house of the Legislature to terminate a peacetime emergency is "too weak" of a check on the Governor's powers. *See* Minn. Stat. § 12.31, subd. 2(b). As long as the Governor enjoys a "slim majority" in just one house of the Legislature, Snell argues, the "purported legislative check" is meaningless. But this argument relies on a presumption that members of the Governor's political party are incapable of exercising independent judgment to terminate a peacetime emergency when they believe it is necessary to do so. To assume that all Minnesota legislators would blindly acquiesce to

19

party loyalty in the face of an unabashed "power-grab" by the Governor, as Snell describes it, would require us to take too cynical a view of Minnesota's government. We refuse to assume that the Legislature would act so wholly upon partisan interests that it becomes incapable of checking the Governor's powers in the manner it itself provided.

Finally, we note that the Act avoids the problems posed by the statute that was declared unconstitutional by the Michigan Supreme Court. The Michigan statute differs from the Act in an important way: although the scope of the delegated powers under both statutes are substantially broad, under Michigan's statute, "those powers may be exercised until a 'declaration by the governor that the emergency no longer exists.' " *In re Certified Questions*, 958 N.W.2d at 21 (quoting Mich. Comp. Laws § 10.31(2) (2020)). The Michigan Supreme Court concluded that the "indefinite" duration of the emergency powers under Michigan law "considerably broaden[ed] the scope of authority conferred." *Id.*

The Act under which the Minnesota Governor exercised emergency powers, by contrast, places durational limits on the powers and subjects them to termination by the Legislature. *See* Minn. Stat. § 12.31, subd. 2(a), (b) (providing that a peacetime emergency "must not be continued for more than five days unless extended by resolution of the Executive Council up to 30 days" and may be terminated after 30 days by a majority vote of each legislative body). Therefore, the separation of powers concerns in this case are not as great as in the case before the Michigan Supreme Court, where "the Governor possesse[d] free rein to exercise a substantial part of [Michigan's] state and local legislative authority—including police powers—*for an indefinite period of time*." *In re Certified Questions*, 958 N.W.2d at 24 (emphasis added).

20

*     *     *

The breadth of authority granted to the Governor under the Act is great, but so is the need of the executive branch to respond quickly in times of crisis. A delicate balance must be struck to ensure that Minnesotans are protected from both government overreach and emergent threats to their health. For the reasons given above, we conclude that the Act strikes this balance in a way that passes constitutional muster. We also note that only the initial declaration of a peacetime emergency is before us, and not the subsequent emergency orders issued by the Governor over the course of the COVID-19 pandemic. Those days, thankfully, are behind us, and these issues are now moot.

In sum, we conclude that Governor Walz was authorized in declaring a peacetime emergency in response to the COVID-19 pandemic and that the Act is not an unconstitutional delegation of legislative authority.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.


PROCACCINI, J., took no part in the consideration or decision of this case.

21

ANDERSON, Justice (concurring).

I concur.  Although I agree that the Act does not violate separation of powers principles, appellants have advanced arguments that, particularly with executive branch emergency orders issued over extended periods of time, raise serious concerns requiring legislative consideration.  Experience has shown that legislative attention is necessary when the executive acts in prolonged periods of emergency.  *Cf.* Richard Briffault, *States of Emergency: COVID-19 and Separation of Powers in the States*, 2023 Wis. L. Rev. 1633, 1663 (2023) (observing that, during the pandemic, many governors "effectively wielded the police power of their states").  The reservation by the Legislature of the right to terminate broad powers delegated indefinitely to the executive—although constitutional here—is, at best, a weak protection against the potential for an improper concentration of governmental power in the executive branch.  As appellants note in their principal brief, the right to terminate an executive branch emergency order, under the current statutory scheme, is only effective if both the house of representatives and the senate act to do so.[1]

---

[1]    Appellants note, accurately, that at the time of the emergency orders, the partisan division then prevailing in the legislative branch was one branch of the Legislature controlled by the Governor's political party with the other branch controlled by a different political party, resulting in no legislative action.  The problem for appellants, as a matter of constitutional analysis, is that the Minnesota Constitution protects only the institutional rights of the legislative and executive branches; our constitution is silent on the subject of political parties.  *See* Minn. Const. art. III, § 1 (articulating the separation of powers).  It may well be that, given various combinations of partisan control of the house, the senate and the executive branch, the reservation by the Legislature of the right to terminate the use of emergency power by the executive branch is more effective in some circumstances and less effective in other circumstances.  Those differences do not make the statutory

Amending the Act to require more active participation from the Legislature would put the Act on safer constitutional ground.

As a result of executive actions taken during the COVID-19 pandemic, legislatures nationwide have introduced more than 750 bills aimed at limiting the emergency powers of governors and state health officials. Maggie Davis et al., *Emergency Powers and the Pandemic: Reflecting on State Legislative Reforms and the Future of Public Health Response*, 21(7) J. Emergency Mgmt. 19, 20 (2023) (stating that, of the 750 bills, at least 70 passed, and at least 25 states enacted proposed limitations into law).[2] And six states require affirmative legislative approval in order for a governor to retain emergency powers after a set period. *See* Alaska Stat. § 26.20.040 (2023) (Alaska); Kan. Stat. Ann. § 48-924 (2023) (Kansas); Mich. Comp. Laws § 30.403 (2023) (Michigan); S.C. Code Ann. § 25-1-440 (2023) (South Carolina); Wash. Rev. Code § 43.06.220 (2023) (Washington); Wis. Stat. § 323.10 (2022) (Wisconsin).

---

design, as created by the Legislature, unconstitutional. Partisan divisions, even bitter partisan divisions, have been an ongoing feature of Minnesota political life dating back to territorial days. As a territory and before statehood, Minnesota had two competing draft constitutions, each authored by a different political party and considered by a separate political party convention, before finally settling on one constitution that was submitted to and approved by the United States Congress. William Anderson in collaboration with Albert J. Lobb, A History of the Constitution of Minnesota 92–110, 136–41 (1921). Partisanship is not a recent invention.

[2] *But see* Davis, *supra*, at 21 (noting that "[t]hough less common . . . several states passed laws that . . . provid[e] governors and state health officials more emergency and public health response tools").

With the benefit of hindsight, our Legislature may well wish to consider changes to Minnesota's emergency management procedures that would better preserve, to the extent practicable, policy deliberation in its proper home: the legislative branch.[3]

As the branch "sufficiently numerous to feel all the passions which actuate a multitude," the Legislature enables minority political constituencies to influence policy decisions in a way that the executive branch cannot replicate. The Federalist No. 48, at 384 (James Madison) (John C. Hamilton ed., 1880). Thus, the Legislature, "by becoming more organized, proactive, and assertive in the use of [its] authority, can ensure that [the State's] responses to emergencies are consistent with the judgment of the public." Joseph Postell, *Emergency Powers and State Legislative Capacity During the COVID-19 Pandemic*, 15 N.Y.U. J.L. & Liberty 628, 639 (2022).

There is no requirement for the Legislature to grant emergency powers to the executive. But if it chooses to do so, it is the Legislature that devises what emergency powers to assign to the executive and the system of oversight that keeps these necessarily broad powers in check.

---

[3] Other possibilities that might merit legislative attention include requiring more detailed findings justifying additional emergency decrees or the use of supermajority voting requirements. Indeed, the Legislature has already entertained some alternative practices by introducing bills that would require affirmative approval of the Legislature to extend executive emergency powers. *See* S.F. 955, § 1, 93rd Minn. Leg. 2023 (requiring three-fifths majority approval requirement from both legislative bodies to extend a peacetime emergency beyond 30 days); S.F. 3256, § 5, 93rd Minn. Leg. 2023 (requiring majority approval from both legislative bodies to extend a peacetime emergency beyond 5 days). Note that the Minnesota Constitution has a similar supermajority requirement for the approval of bonding proposals. Minn. Const. art XI, § 5(a) (requiring a three-fifths majority approval in both houses of the Legislature for the issuance of bonds).

The more prolonged an emergency becomes, the greater the need to delineate the limits upon the authority of the executive branch. But it is to the policy making branches—the legislative and the executive—that this duty is assigned, not the judicial branch. And the time to address these fundamental issues dealing with the distribution of, and a check upon, political power is when no emergency is present.

# Minnesota rural hospital workers feel the strain as colleagues leave, COVID stays

**[Catharine Richert](#)**
Aitkin, Minn.
February 17, 2022 4:00 AM

*Minnesota rural hospital workers feel the strain as colleagues leave, COVID stays*



Registered nurse Lisa Streadwick (left), pharmacist Travis Sporre and nurse supervisor Donna Corey listen to feedback from patient Kathryn Lathrop on Feb. 2 during an early morning huddle at Riverwood Healthcare Center in Aitkin, Minn. The early morning huddles are conversations between health care providers and the patient allowing for all care parties to be on the same page and for the patient to provide feedback.
Derek Montgomery for MPR News

Nurses often juggle a lot of duties at once. So when Donna Corey had to manage the care of a patient one day last week, she didn't hesitate, even though it's a job she wouldn't normally do as a nursing supervisor.

Over the last two years, Corey has had to take on more responsibility, more often. Her colleagues at Riverwood Healthcare Center in Aitkin are doing the same, as they manage pandemic-related labor shortages.

It's the work on top of the work that's been hard, Corey said. Every shift is a sprint to fill in for missing workers and to care for a crush of ill patients.

"It has been stressful. And as we have nurses out sick, and [with]more community-based needs, those [responsibilities] increase," she said.

Signs of that extra work are everywhere at Riverwood — like the pager Corey carries with her.

She and her team spent a recent shift trying to transfer a patient who needed a higher level of care to a larger hospital. It's become a time-consuming and routine part of her daily work as COVID-19 patients stretch capacity at large hospitals that typically accept patients Riverwood is not equipped to care for.



Internal medicine doctor and hospitalist Dr. Joselito Burgos (left) talks to patient Kathryn Lathrop at Riverwood Healthcare Center in Aitkin, Minn. while pharmacist Travis Sporre (right) takes notes on a tablet.
Derek Montgomery for MPR News

"I know that [my coworkers] probably called 10 different places last night, and weren't able to transfer [the patient] and now we're starting over today," she said. "That's a lot of the day on the phone, calling somebody and that takes a whole person to do."

On the tail end of yet another COVID surge, Riverwood serves as a microcosm for the labor shortages hospitals everywhere are juggling — one built upon a health care system that didn't staff beyond its immediate needs to begin with.

By one national estimate, nearly 1 in 5 health care workers have left the field since the start of the pandemic.

- **Despite plans, precautions, COVID nearly broke Minnesota hospitals** Here's why
- **'We are in a crisis'** Fargo hospital slammed with COVID cases

The exodus is fueled by burnout stemming from the pandemic: extra hours to fill in for colleagues; the relentless stream of COVID-19 patients, many of whom have chosen to forgo a vaccine; having to keep patients who need speedy transfers stable for extended periods of time when hospitals are completely full.

Meanwhile, some employees have left permanent jobs for lucrative traveling positions, and their colleagues are left behind to pick up that slack, too.

For rural hospitals, like Riverwood, it's put into sharp focus struggles to attract new employees prior to the pandemic due to geography, said Mark Holmes, director of the Sheps Center for Health Services Research at the University of North Carolina at Chapel Hill.

"Imagine hiring, say, a respiratory therapist. This would almost certainly mean recruiting from elsewhere, which probably means moving to the town. That's harder than in an urban area where there are likely [people] more with that training," he said.

## Nowhere to transfer severely ill patients

In every department of Riverwood, a 25-bed critical access hospital, staff said they've had to do more with less during the pandemic.

In the hospital's lab, manager Jake DeZeeuw has two open positions and is down by one employee.

"But when we talk about how we only have eight or nine bodies, one is a pretty good percentage of it," he said. So his team is "all doing a little bit more with different shifts than what they used to work before."

DeZeeuw even jumps in when needed.



Riverwood Healthcare Center lab manager Jake Dezeeuw.
Derek Montgomery for MPR News

In the emergency room, chief medical officer Dr. David Taylor said his added stress came from treating patients who need higher levels of care, a byproduct of larger hospitals being clogged with COVID-19 patients and understaffed as well.

"This fall, we had my worst day," he said, referring to a situation when he and his team managed five patients who all needed to be admitted or transferred immediately.

But there was nowhere for them to go, he said.

During the fall hospital crunch, Taylor said his skills were stretched as he kept patients stable.

"There is a difference between inpatient care and acute care emergency room management," he said. "And there's a lot of overlap, but I haven't done [inpatient care] since I was just out of residency."



Riverwood Healthcare Center chief medical officer and emergency room physician David Taylor at Riverwood Healthcare Center in Aitkin, Minn.
Derek Montgomery for MPR News

- **Minnesota COVID surge**   Creates dangerous ER bottlenecks

Meanwhile, Riverwood has lost employees. In 2021, staff turnover was 15 percent — a high watermark for the organization.

People left for a host of reasons, said human resources chief Lee Reichenbach.

"Early retirements, that was a big one," he said. "Some [left] to take other jobs. In this current landscape, you can walk across the street and get another job at another place just because everybody has needs."

Prior to the pandemic, Reichenbach said it was already tough to find new employees because in small, aging communities like his, there aren't many younger people looking for work.

But now, with 22 jobs open at Riverwood, it's become even more challenging. To attract workers in a highly competitive environment, Reichenbach's team has started using sophisticated online tools to lure even passive job seekers.

And they're offering signing bonuses of up to $10,000 for some positions.

Filling open jobs is critical to the hospital's mission — because during the pandemic, demand for their services has actually grown, said chief financial officer Casey Johnson. The growth is fueled by COVID-19 but also by the volume of aging patients Riverwood serves.

"If you start to lose people, because of this demand, and you start getting an exodus there, you can't take care of people in your community," he said. "That's what we're trying to avoid."

## A turnstile of temporary workers

What Riverwood is experiencing mirrors trends playing out around the country and it has had far-reaching implications for hospital finances.

Complicating matters is the unprecedented shift of hospital staff from salaried positions to traveling positions — highly lucrative, short-term positions that draw scarce medical staff away from their local communities.

It's a challenging dilemma because when people leave hospitals for traveling jobs, those vacancies may be backfilled, sometimes with more traveling providers, said Erik Swanson, senior vice president of data and analytics for Kaufman Hall.

"And then the hospitals, in order to take care of their patients, were required to actually hire those resources," he said. "That has placed tremendous strain on a number of organizations and rural hospitals alike."

Riverwood lost five staff members to traveling jobs last year, and in early February, had 12 traveling providers on the payroll to help backfill shortages. Normally, the hospital might have one traveling worker at a time.

A contract worker might have been paid 25 percent more just a year or two ago, said Johnson. Now Riverwood typically pays 50 to 100 percent more.

"The situation of travel nurses may be a 'win' for nurses who have been underpaid for a long time," said Emily McCartha, a researcher with the Sheps Center at the University of North Carolina at Chapel Hill. But because traveling nurses tend to make more money than permanent staff, "if they're working on a team with nurses making less but conceivably knowing more at least about the employment setting, [it] can cause tension."

## A 'gold rush'

That's been the case at Riverwood.

Contract workers have been essential in giving Riverwood's overworked staff a break, said interim chief executive officer Cindi Baker. But the turnstile of temporary workers has also strained employee morale.

"They know that that traveler is making more money than they are and they feel like they're probably doing a superior job because they know the way here," she said. "There's a gap there."



Riverwood Healthcare Center interim CEO Cindi Baker talks during a conversation about working at Riverwood Healthcare Center during COVID earlier this month.
Derek Montgomery for MPR News

In the emergency room, nurse manager Drew Van Santen said the cycle of losing staff to travel positions only to hire more represents an "absolute gold rush."

"People are making ridiculous sums of money to do the same work that they were doing at their primary location," he said. "I'm happy for you on one side. But at the same time, what other areas are suffering as a result of your departure?"

For the Riverwood staffers who have stayed through the pandemic, the departure of colleagues and the additional work stemming from COVID has been the most stressful part of the job.

## A hopeful sign

Back on the hospital floor, nurse Donna Corey finally got some good news around lunch time: A larger hospital sent a helicopter for the patient she had been trying to transfer.

She said it was a relatively quick turnaround time given the long waits patients have faced this winter — and a sign that maybe, the latest wave of COVID is starting to ebb.

"We're always optimistic, but then it seems like the ripple comes back," she said. "So hopefully, hopefully it is."



A helicopter arrives to transport a COVID patient to another facility on Feb. 2 at Riverwood Healthcare Center in Aitkin, Minn.
Derek Montgomery for MPR News